**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HELEN HANKS on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>vs.<br><br>THE LINCOLN LIFE & ANNUITY COMPANY OF NEW YORK; VOYA RETIREMENT INSURANCE AND ANNUITY COMPANY, formerly known as Aetna Life Insurance and Annuity Company,<br><br>    Defendants. | Civil Action No. 16-cv-6399<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Helen Hanks, on behalf of herself and all others similarly situated, for her Complaint against defendants The Lincoln Life & Annuity Company of New York and Voya Retirement Insurance and Annuity Company, states as follows:

**NATURE OF THE ACTION**

1. This is a class action brought by plaintiff on behalf of herself and all similarly situated owners of life insurance policies issued by Aetna Life Insurance and Annuity Company (now Voya Retirement Insurance and Annuity Company, "Aetna") who have been subject to unlawful cost of insurance ("COI") increases imposed by The Lincoln Life & Annuity Company of New York ("Lincoln"). Even though the policies were all issued by Aetna, Lincoln — a total stranger to the policy and a completely unrelated company to Aetna — sent letters to thousands of policyholders announcing that their policies would be hit with large COI increases effective June 1, 2016. The increase violates the plain terms of the contract: the form policies provide that a COI increase can only be based on *Aetna's* (the insurer's) expected future costs. But the Lincoln COI increase is wrongly based on *Lincoln's* expected future costs – even though Lincoln

1

is not a signatory to the policies, is mentioned nowhere in the contracts, Lincolns' costs are different than Aetna's, and policyholders contracted only with Aetna and agreed that COI rates could be increased only based on a change in Aetna's costs.

2. The policies at issue are all universal life and variable universal life policies (collectively, "UL") issued by Aetna ("Aetna policies"). The principal benefit of UL policies is that, unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies are flexible and need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is typically the highest expense charge that a policyholder pays. As a result, the provision in the policy explaining how and when COI charges can be adjusted is one of the most important terms of the contract.

3. One principal benefit of UL policies is they permit policyholders to pay the minimum amount of premiums necessary to keep the policies in-force. This allows policyholders to minimize their capital investment and generate greater rates of return through other investments. Any premiums paid in excess of COI charges and expense components are applied to a policy's "accumulation account," sometimes known as "policy account" or "cash value." These excess premiums earn interest, often called the credited rate.

4. In May 2016, Lincoln began informing owners of Aetna policies that they would be hit by a large COI rate hike (the "Lincoln COI Increase"). The size of the Lincoln COI Increase is staggering: Lincoln announced increases between at least 15 and 55 percent, and said that the increase "affects all policyholders holding the affected products." In private notices sent to brokers, Lincoln explained that the increases were due to *Lincoln's* "altered expectations of cost factors" – even though the contract required any increase to be based on a change in "*Aetna's* estimates for future cost factors."

5. Lincoln claims that the 2016 COI increase was justified based on a "material changes in future expectations of key cost factors associated with providing this coverage, including lower **investment income** and higher **reinsurance costs**," but these are Lincoln's costs, not Aetna's. As a result, Lincoln is unlawfully imposing an increase on Aetna policies based on an apples-to-oranges comparison between *Aetna*'s original expected costs and *Lincoln*'s new expected costs – even though the form insurance contract expressly provides that an increase could be based only on the oranges-to-oranges comparison between *Aetna's* original costs and *Aetna's* current costs

6. Finally, even if Lincoln were permitted to increase COI rates for Aetna policies based on Lincoln's costs (which it is not), the COI increase still breaches the terms of the policy because the increase was based on Lincoln's desire to increase profits, not based on "estimates for future cost factors," as required by the contract. The rationale provided for the COI increase is a change in estimates for future cost factors of investment returns and reinsurance costs – but those estimates are not sufficient to and do not justify the COI increases imposed of between 15% and 55%.

## THE PARTIES

7. Helen Hanks is the owner of an Aetna UL policy insuring her own life and is a citizen of Texas. The policy was issued on or about January 10, 1984 ("Hanks Policy"). The Hanks Policy is subject to the 2016 COI Increase.

8. Defendant The Lincoln Life & Annuity Company of New York ("Lincoln") is a life insurance company organized under the laws of New York, with a principal place of business in Syracuse, New York. Lincoln sent notice of the COI increase on the Aetna policies to plaintiff for the Hanks Policy.

9. Defendant Voya Retirement Insurance and Annuity Company is a corporation organized under the insurance laws of the State of Connecticut. Prior to January 1, 2002, Voya was known as Aetna Life Insurance and Annuity Company. Aetna issued the Hanks Policy.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

11. This Court has personal jurisdiction over Lincoln and Aetna because Lincoln's principal place of business is in New York; Lincoln claims that it is acting as the administrative agent for these Aetna policies; and events giving rise to this lawsuit occurred in New York.

12. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because events giving rise to the causes of action occurred in this District and the New York City Life Bureau of the New York State Department of Financial Services maintains records about the Lincoln COI Increase but has refused to produce them in response to an open records request due to a current investigation being conducted by that office.

## FACTUAL BACKGROUND

### A. The Policies at Issue

13. The policies at issue are UL policies issued by Aetna between 1983 and 2000. These policies are all flexible-premium, universal life or variable universal life policies, and there are no fixed or minimum premium payments specified in the policies. A copy of the Hanks Policy, redacted of personal information, is attached as Exhibit A.

4

14. The size of the COI charge is highly significant to plaintiff and all UL policyholders for at least two important reasons: (a) the COI charge is typically the highest expense that a policyholder pays; and (b) the COI charge is deducted from the policy account (i.e., the savings component) of the policy, so the policyholder forfeits the COI charge entirely.

15. Aetna's insurance policies limit its ability to increase COI rates. The Hanks Policy contains the following contractual limitation:

- "The monthly Cost of Insurance rates may be adjusted by Aetna from time to time. Adjustments will be on a class basis and will be based on *Aetna's* estimates for future cost factors, such as mortality, investment income, expenses and the length of time policies stay in force."

- Any COI rate hike must be made "on a uniform basis."

16. On information and belief, all polices hit by the 2016 increase contain the same terms as above. The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. They are all contracts of adhesion.

### B. Aetna's Sale of Policies To Lincoln Though 100% Indemnity Reinsurance

17. In 1998, the press reported that "Aetna has agreed to sell its domestic individual life insurance business to Lincoln National Corp. for $1 billion in cash under an indemnity reinsurance agreement." Aetna did not seek consent from policyholders for this sale, or formally notify them at the time. While it was styled as an "indemnity reinsurance agreement," it was, for all practical purposes, a sale. Under the deal, Aetna ceded 100% of the risk on these policies to Lincoln, put Lincoln in charge of administering these policies, and gave Lincoln the right to premium and other proceeds on these policies (including COI charges).

18. Aetna received $1 billion in cash and over 600,000 policies were transferred, as part of this sale. The sale included all of Aetna's non-group life insurance business, which includes all policies hit by the recent COI increase. As part of this transaction, Lincoln hired the

5

bulk of Aetna's employees who were running the business, so that Lincoln could take over the administration of these policies. In Lincoln's correspondence to brokers regarding the COI increase, Lincoln describes itself as the "administrative agent and reinsurer for the policies."

19. The total outstanding death benefit on individual life insurance policies covered by the reinsurance contract was $11.4bn as of December 2015 (2014: $12.2bn). The total premiums received by Lincoln for these policies in 2015 was $114.9m (2014: $123m).

20. Since Lincoln is now in charge of administering the policies and is contractually obligated to pay Aetna for all death benefits, all the costs associated with the policies are borne by *Lincoln* not Aetna. Aetna's returns and regulatory filings confirm that Aetna has virtually *no economic interest in these policies*. For 2015, Aetna reported net income of $1.0m and expenses of $1.0m for this block (in 2014, it was $0.4m in net income and $1.1m expenses). These are trivial amounts for a block of $12bn of death benefit with $120m of annual premium received by Lincoln.

21. While Aetna effectively sold the entire block to Lincoln, it structured the transaction as an indemnity reinsurance agreement. This means that policyholders are still only in contractual privity with Aetna, and Aetna is still the only counterparty to the individual life insurance contracts – for example, Aetna is legally required to pay death benefits to policyholders, even though Lincoln promised to "indemnify" Aetna for all those costs.

22. There are 2 main methods for selling an entire block of an insurance business through reinsurance: (1) assumption reinsurance, and (2) indemnity reinsurance. The key difference between these structures is that in an assumption reinsurance transaction the policyholder must <u>consent</u> to the transaction, as it relates to the policyholder's individual policy,

while in an indemnity reinsurance transaction the policyholder is <u>not required to consent</u> to the transaction and, in fact, the transaction is often 'invisible' to the policyholder.

23. Typically, when an insurance company wishes to get out of its block of business altogether, it uses assumption reinsurance because that novates the contracts and makes the reinsurer the party to the contract with the policyholder. But that type of transaction requires (1) consent from the policyholder, and also (2) often requires regulatory approval, which can be stringent, expensive and time-consuming. Aetna and Lincoln sought to avoid these two difficulties by entering into an indemnity reinsurance agreement, but there is a consequence to how those two companies structured the deal: Aetna remained the counter-party to the contract with the policy owner, and under the terms of that form contract, only *Aetna's* future cost factors (of which there are *none*, since it is out of the business completely) justify a COI increase, not *Lincoln's*.

24. Lincoln and Aetna effectively want to rewrite the contract to say that Lincoln's costs – not Aetna's – may drive a COI increase, but that is not what the form insurance contracts provide nor allow.

C. **Lincoln's Unlawful COI Increases**

25. On May 9, 2016, Lincoln (not Aetna) sent increase notices to policyholders of 18 Aetna product lines, announcing an increase effective June 1, 2016. In the letter, Lincoln describes itself as "acting as administrative agent for Voya Retirement Insurance and Annuity Company." The letter states that the increase "affects all policyholders holding the affected products," which likely includes thousands of policyholders. Lincoln told brokers that the COI increases are the result of "material changes in future expectations of key cost factors associated with providing this coverage, including lower **investment income** and higher **reinsurance**

**costs**." In all their disclosures, these 2 cost factors – investment income and reinsurance costs – are the only ones that Lincoln identified as allegedly justifying the increase. In the materials sent by Lincoln to advisors, Lincoln described itself as the "administrative agent and reinsurer" on these policies, and explained that the increases were made in light of "*our* [i.e., *Lincoln's*] altered expectations of cost factors," which "involved an in-depth actuarial analysis."

26.     The policy permits a COI increase only if the adjustment is "based on Aetna's estimates for future cost factors, such as mortality, investment income, expenses and the length of time policies stay in force." When the policies were priced and the contracts entered into, the COI rates were based on *Aetna's* future cost estimates – for example, how much investment income that Aetna expected to earn on the policies. These future cost estimates vary by carrier: for example, Aetna's expected investment returns will be different than Lincoln's expected investment returns.  In short, these policies were:

- *Sold* by Aetna,
- *Issued* by Aetna,
- *Priced* based on Aetna's assumptions of Aetna's costs.

A reasonable policyholder would therefore understand the contract to mean what it says:  COI rates can be increased only if *Aetna*'s expected future costs have changed. Actuarial principles also require that assumptions underlying an insurer's COI rates relate to that insurer's actual experience, and no one else's. *See, e.g*., ASOP 24, section 3.4.2 ("The actuary should select assumptions underlying an *insurer's* disciplined current scale that logically and reasonably relate to actual experience as reflected  *within the insurer's* nonguaranteed element framework." (emphases added)).

27.     But here, Aetna no longer has any costs associated with these policies; the costs are borne by Lincoln. So the COI increase and its massive size cannot be justified based on Aetna's costs. If Lincoln wanted to be able to increase COI rates based on *Lincoln*'s costs, it would have had to become a party to the contract with the policyholder, then rewrite the contracts to say a COI increase was permitted due to changes in *Lincoln's* costs, and it would have needed policyholder consent to do that, none of which happened. Having avoided the costs and difficulties of that approach, Lincoln and Aetna can't have its cake and eat it too by increasing COI rates based on Lincoln's costs, rather than on Aetna's costs, which are the *only* costs enumerated in the Aetna contract that can be basis of the COI increase.

28.     In Lincoln's correspondence with brokers, Lincoln identified 2 costs that are driving the increase: investment income and reinsurance costs. Those are *Lincoln's* costs. Neither cost is Aetna's, as the contract requires.

### i) Lincoln's COI Increase Is Not Based on Aetna's Investment Income

29.     Investment income refers to the income that an insurance company generates from investments on earnings from its entire portfolio of relevant insurance policies. Different insurers earn, and expect to earn, different returns on their investment portfolios.

30.     In a 2008 filing by Aetna to the National Association of Insurance Commissioners ("NAIC"), Aetna stated that it had begun using its reinsurers' (Lincoln's) assumptions for investment income, rather than its own. Aetna also explained that while Aetna had been using an "investment generation approach" for evaluating investment income, the reinsurer (Lincoln) adopted a "portfolio average approach" for evaluating investment income. Under Lincoln's portfolio average approach, the profitability of the business is measured using a pro rata share of investment income from a larger pool of assets, which is managed on an overall basis for the

9

liquidity needs of Lincoln. By contrast, under Aetna's investment generation approach, the assets under management are matched (for accounting purposes) against policies by generation, such that assets purchased in time of higher interest rates (e.g., 1980s-1990s) are matched with business written at the time, and assets purchased in times of low interest rates are matched with new business written at that time. Because there were high interest rates in the 1980s and 1990s and lower interest rates in the 2010s, changing from Aetna's investment generation approach to Lincoln's portfolio average approach in evaluating investment income hurts older blocks of policies – such as those owned by plaintiff and all victims of the Lincoln COI Increase, which were policies issued between 1983-2000. By violating the terms of the policy and switching the measure of future costs from Aetna's to Lincoln's, who measures investment income in very different ways, policyholders were harmed.

31. As Aetna has conceded in its NAIC filings, any investment income experience driving the increase is Lincoln's, not Aetna's. Aetna reported $1.38bn of investment income in 2015 (2014 $1.32bn). Of this, Aetna allocated net investment income of $0 in 2015 to the business line it describes as "Closed block-Lincoln" life insurance policies (2014 and 2013 allocations were also $0). When the policies were sold to Lincoln beginning in 1998, Lincoln received from Aetna the right to all premiums and insurance charges paid on the policies – and those funds constitute the pot of money from which Lincoln earns investment income. While Aetna retained prior profits and a $1bn sale fee from this business, Aetna has not allocated *any* of their net investment income to these policies. The Second Amended and Restated Asset Purchase Agreement between Aetna and Lincoln (Dated May 21, 1998) states that Aetna shall pay to Lincoln an amount in cash and cash equivalents to cover the Liabilities transferred (see Section 2.03c of the agreement) which included General Account Reserves (see definition of "Closing

Date Liabilities" in the agreement). This would include the reserves for Universal Life Policies – in other words, Aetna transferred the assets which back the Universal Life policies to Lincoln and from then on, the investment income which derives from these assets was controlled and received by Lincoln, not Aetna.

### ii) Lincoln's COI Increase Is Not Based on Aetna's Reinsurance Costs

32. Lincoln has not publicly explained what precise "reinsurance costs" it claims is driving the COI increase, but those reinsurance costs are not Aetna's. While some reinsurance agreements between other carriers have provisions that allow the reinsurer to raise premiums on the ceding insurer if mortality (or other) experience is worse than expected, the Aetna-Lincoln reinsurance agreement is not one of those agreements. A feature of 100% indemnity reinsurance agreements like the one entered into between Aetna and Lincoln is that no continuing reinsurance premiums are paid by the ceding reinsurer. This was an outright sale, which is "reinsurance" in name only. The terms of the Coinsurance Agreement between Aetna and Lincoln, dated October 1, 1998, provide that Lincoln shall indemnify Aetna for 100% of Liabilities arising under the policies, while Aetna transferred to Lincoln all their rights and interests to premiums under the policies. The coinsurance agreement was structured as part of The Second Amended and Restated Asset Purchase Agreement between Aetna and Lincoln (Dated May 21, 1998) to give the transaction the features of a sale. Thus, Lincoln has no right to terminate the coinsurance agreement, while Aetna only has right to recapture policies if Lincoln defaults or becomes a weak credit, making the transfer of rights permanent in nature. There are only a few minor procedural exemptions from clause 13.11 – that each party shall bear their own costs – thus meaning that the purchase price of $1 billion is essentially a non-recourse purchase price for the business and Lincoln is not able to retrospectively adjust it or charge future

11

expenses to Aetna.  This is confirmed by Aetna's returns filed with regulators, which show that Aetna has virtually no economic interest in these policies. The coinsurance agreement covers "Non-Guaranteed Elements" of the policies, including COI charges and other policy expenses loads and credits. The agreement provides that Lincoln may make "recommendations" for changes to Non Guaranteed Elements, and Aetna shall set Non Guaranteed Elements taking into account the reinsurer's recommendations – thus it is Lincoln and not Aetna who made the determination that COI rates should be increased based on Lincoln's costs.

### iii)  **The COI increase is not based on "estimates for future cost factors"**

33. Even if Lincoln were permitted to perform the role of increasing COI rates based on Lincoln's costs (which it is not), the COI increase still breaches the terms of the policy because the increase was not based on "estimates for future cost factors."  By limiting COI changes to being based only on estimates for future cost factors, the contract forbids COI increases that are based on a carrier's desire to increase profits. The rationale provided for the COI increase is estimates for future cost factors of investment returns and reinsurance costs – but those estimates are not sufficient to and do not justify the COI increases imposed of between 15% and 55%. Lincoln National's Q2 2016 reporting supplement shows a 5.22% earned rate on reserves, a mere 10 basis points lower than the prior year. Lincoln National's recent earning's releases do not mention losses due to increased reinsurance costs at all – in fact their Q4 2014 results show a $53m profit on recapturing policies from out of reinsurance contracts, while mortality (the most important element in COI charge rates) has improved nationwide since the policies were issued. These facts point to a different reason for and basis of the COI increase: Lincoln is increasing its profit targets on an old, closed block. This is further supported by the fact that profit margins are mentioned as a factor in determining Non Guaranteed Elements in the

NAIC returns for Aetna, while Lincoln's determination policy on non guaranteed elements does not explain how it deals with profit targeting for policies acquired by reinsurance.

## CLASS ACTION ALLEGATIONS

34. This action is brought by Plaintiff individually and on behalf of the following class—referred to herein as the "2016 COI Increase Class"—which consists of:

> All owners of universal life (including variable universal life) insurance policies issued by Aetna Life Insurance and Annuity Company (now Voya Retirement Insurance and Annuity Company) that were subjected to the cost of insurance rate increase announced in 2016 (excluding defendants Voya and Lincoln, their officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing).

35. This class consists of hundreds of consumers of life insurance and is thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by Aetna or Lincoln.

36. The claims asserted by Plaintiff are typical of the claims asserted by the 2016 COI Increase Class.

37. Plaintiff will fairly and adequately protect the interests of the 2016 COI Increase Class and does not have any interests antagonistic to those of the other members of this class.

38. Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters, COI increase matters, as well as class and complex litigation.

39. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

40. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include:

(a) the construction and interpretation of the form insurance policies at issue in this litigation;

(b) whether Lincoln's and Aetna's actions to increase the cost of insurance charges on certain UL policies violated the terms of those form policies;

(c) whether Aetna breached its contracts with the class members;

(d) whether Plaintiff and Class members are entitled to receive damages as a result of the unlawful conduct by defendants alleged herein and the methodology for calculating those damages;

(e) whether Lincoln was unjustly enriched by its conduct.

41. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when defendants' liability has been adjudicated, claims of all class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d) without a class action, many class members would continue to suffer injury, and defendants' violations of law will continue without redress while defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

**Breach of Contract against Aetna (on behalf of Plaintiff, and the 2016 COI Increase Class**)

42. Plaintiff realleges and incorporate all allegations of this complaint as if fully set forth herein.

43. The subject policies are binding and enforceable contracts.

44. The 2016 COI rate increases have materially breached the policies in several respects, including but not limited to the following:

(a) The 2016 COI rate hike breached the policies by basing the increase on a third-party's costs, not Aetna's;

(b) The 2016 COI rate hike breached the policies by determining COI rates based on factors not enumerated in the policies.

(c) The 2016 COI rate hike breached the policies by not basing the adjustments on estimates for future cost factors.

45. Plaintiff has performed all of its obligations under the policies, except to the extent that its obligations have been excused by Aetna's conduct as set forth herein.

46. As a direct and proximate cause of Aetna's material breaches of the policies, plaintiffs and the classes have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment against Lincoln (on behalf of Plaintiff, and the 2016 COI Increase Class)

47. Plaintiff incorporates all proceeding paragraphs by reference.

48. It would be inequitable for Lincoln to be permitted to retain the benefit obtained from the illegal 2016 COI increase, which Lincoln obtained from their wrongful conduct and at the expense of plaintiff and members of the Class.

49. Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Lincoln from its unjust enrichment and inequitable conduct.

50. Alternatively or additionally, Lincoln should pay restitution of its own unjust enrichment to plaintiffs and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding Plaintiff and the class compensatory damages, restitution, disgorgement, and any other relief permitted by law or equity pursuant to the First and Second Claims for Relief;

3. Awarding Plaintiff and the class pre-judgment and post-judgment interest pursuant to their First and Second Claims for Relief, as well as costs;

4. Awarding a penalty in the amount of all premiums paid to Aetna or Lincoln by Plaintiffs and members of the Classes for the life insurance policies;

5. Awarding Plaintiff and the Class such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: August 11, 2016

s/ Seth Ard
Steven G. Sklaver (*pro hac vice* application to be filed)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Tel:   310-789-3100
Fax:   310-789-3150
ssklaver@susmangodfrey.com

Seth Ard
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019
Tel.:   212-336-8330
Fax:   212-336-8340
sard@susmangodfrey.com

*Attorneys for Plaintiff*