UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
HELEN HANKS, on behalf of herself and all
others similarly situated,

                          Plaintiff,                          16-cv-6399 (PKC)

          -against-                                           OPINION
                                                              AND ORDER
VOYA RETIREMENT INSURANCE AND
ANNUITY COMPANY, formerly known as
Aetna Life Insurance and Annuity Company,

                          Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

          Plaintiff Helen Hanks ("Hanks") brings suit against Voya Retirement Insurance and

Annuity Company ("Voya"), formerly known as Aetna Life Insurance and Annuity Company

("Aetna"), on behalf of a nearly nationwide class of the owners of certain life insurance policies

issued by Voya and asserts a single breach of contract claim.  The class was certified in an Opinion

and Order filed March 13, 2019.  (Doc 110).  With discovery closed, Voya now moves for

summary judgment dismissing Hanks' claim and Hanks cross-moves for summary judgment.  For

the reasons that follow, Voya's motion will be granted in part and Hanks' motion will be denied.

BACKGROUND AND FACTS

          The facts discussed below are undisputed except where otherwise noted.[1]

I.    The Policies.

          The life insurance policies at issue in this case are universal life or variable

universal life insurance policies, comprising at least 18 different product lines, sold by Aetna

---

[1] Any citation to the parties' Rule 56.1 Statements incorporates by reference the documents and testimony cited
therein.

between 1983 and 2000. (Def.'s 56.1 Statement ¶ 3 (Doc. 135); Pl.'s 56.1 Statement ¶ 6 (Doc. 138); Pl.'s Ex. 2 ¶ 28 (Doc. 143-2); Pl.'s Response to Def.'s 56.1 Statement ¶ 17 (Doc. 139); Def.'s Response to Pl.'s 56.1 Statement ¶ 34 (Doc. 149)). The defining feature of each such life insurance policy is the right of the policyholder to pay a flexible amount rather than a set premium for the life of the policy. (Doc. 135 ¶ 3; Doc. 143-2 ¶ 28). Under the terms of the policies, each policyholder would hold the rights to an account containing any amount paid by the policyholder plus earned interest. (Doc. 135 ¶¶ 4, 6; Doc. 143-2 ¶¶ 13–14). Monthly, the insurer deducts a charge, termed the "cost of insurance" or something similar, from the policyholder's account in order to pay the cost of the policy's coverage, functioning as the equivalent of a monthly insurance premium. (Doc. 135 ¶¶ 4, 6; Doc. 143-2 ¶¶ 13–14). So long as the policyholder's account holds sufficient value to cover the monthly charge on the day of the deduction, the policyholder does not need to pay any additional amount. (Doc. 135 ¶¶ 4, 6; Doc. 143-2 ¶¶ 13–14). If the policyholder's account value is too low to cover the monthly charge, the policyholder would have to pay the amount necessary to cover the shortfall or suffer having the policy lapse for non-payment. (Doc. 135 ¶¶ 4, 6; Doc. 143-2 ¶¶ 13–14).

The monthly charge for a universal life or variable universal life insurance policy may be cheaper than the premium for a more traditional whole or term life insurance policy providing a similar amount of coverage because the charges associated with universal life or variable universal life insurance policies are in part made up of non-guaranteed elements. (Doc. 139 ¶ 5). These non-guaranteed elements, which can include the monthly charge, may be adjusted upwards or downwards by the insurer in accordance with the terms of the policy. (Doc. 139 ¶ 5).

In 1998, Aetna sold its life insurance business, including all of the policies at issue, to The Lincoln Life & Annuity Company of New York ("Lincoln Life") via a reinsurance indemnity transaction.  (Doc. 149 ¶ 9).  Under the terms of this transaction, Aetna remained in contractual privity with policyholders and paid the death benefits associated with the policies, while Lincoln Life indemnified Aetna for all costs associated with the policies and took over the administration of the policies.  (Doc. 149 ¶ 11).  The agreements formalizing this transaction permitted Lincoln Life to recommend to Aetna an increase in the monthly charge for the class policies but did not require Aetna to act on this recommendation.  (Doc. 149 ¶¶ 13–14; Pl.'s Ex 31 at 1 (Doc. 143-23) ("[Aetna] shall set all Non-Guaranteed Elements of the Policies and Post-Closing Policies and all dividends under the Par Policies, taking into account the recommendations of [Lincoln Life].  With respect to such policies, each of [Aetna] shall, in its absolute discretion, either (i) follow such recommendations, or (ii) reject recommendations.").  By January 2014, Aetna was known as Voya.  (Answer ¶ 9 (Doc. 28)).

II.   Hanks' Policy Language.

In 1984, Hanks purchased a universal life insurance policy issued by Aetna (the "Policy").  (Doc. 135 ¶¶ 1–2).  Like all the life insurance policies issued to members of the certified class, the Policy was a contract between Hanks and Aetna under which Aetna promised to pay Hanks or her beneficiary a certain sum of money upon Hanks' death or her redemption of the Policy, so long as the necessary monthly charges were paid to keep the Policy in force.  (Def.'s Ex. 3 at 2, 6 (Doc. 136-3); Pl.'s Ex. 1 at 2, 6 (Doc. 143-1)) ("Premiums are payable until the Maturity Date.  Sufficient premiums must be paid to continue the policy in force until then.").  The Policy listed an initial amount of money, the "Basic Monthly Premium," that would be deducted from Hanks' policy account on one day of the month, the "Monthly Deduction Day."  (Doc. 136-3 at 3).  The Policy stated that, if the amount in Hanks' policy account on the Monthly Deduction

Day was insufficient to cover this monthly charge, the Policy would lapse.  (Doc. 136-3 at 3, 6 ("THIS POLICY MAY TERMINATE PRIOR TO THE MATURITY DATE IF PREMIUMS PAID AND INTEREST CREDITED ARE INSUFFICIENT TO CONTINUE COVERAGE TO THAT DATE.").

The Policy states that the monthly charge required to keep the Policy in force, referred to variously as the "monthly deduction" or the "premium," "is equal to the Cost of Insurance for the policy" and "is deducted from the cash value on each monthly deduction day." (Doc. 136-3 at 7).  Under the terms of the Policy, the "Cost of Insurance" ("COI") on the "Monthly Deduction Day" is determined using a defined formula, which includes the "Cost of Insurance Rate" ("COI Rate") as a primary component.  (Doc. 136-3 at 7).  An increase in the COI Rate therefore increases Hanks' total monthly charge.

The Policy contains a section entitled "Cost of Insurance Rate" which reads:

> **Cost of Insurance Rate**.  The Monthly Cost of Insurance is based on the Insured's sex, attained age and premium class.  Attained age means age on the birthday nearest the first day of the policy year in which the monthly deduction day occurs.  For the Initial Specified Amount, the premium class on the Date of Issue will be used.  For each increase, the premium class for that increase will be used.
>
> The monthly Cost of Insurance rates may be adjusted by Aetna from time to time. Adjustments will be on a class basis and will be based on Aetna's estimates for future cost factors, such as mortality, investment income, expenses and the length of time policies stay in force.  Any adjustments will be made on a uniform basis.  However, the rate during any policy year may never exceed the rate shown for that year in the Table of Guaranteed Maximum Insurance Rates in this policy.   Those rates are based on the 1958

> Commissioners Standard Ordinary Mortality Table,
> male or female.

(Doc. 136-3 at 7).

The Policy issued to Hanks is representative of the policies issued to members of the certified class.  Specifically, the life insurance policies of all other members of the certified class contain either identical language or language that, despite its variation, the parties agree contains no material difference with that of the Policy.  (Doc. 110 at 11).  For instance, the parties agree that there is no material difference between the terms "uniform," as used in the Policy, and "non-discriminatory," as used in other class members' policies.  (Doc. 141 at 14 n.46 ("Certain policies use the word 'non-discriminatory' instead of uniformity.  As relevant here, the Court and the parties all agree there is no material difference between the terms."); see also Doc. 148 at 37).

III.   The 2016 COI Adjustment.

On February 26, 2016, Lincoln Life recommended to Voya an increase in the COI Rate.   (Doc. 139 ¶ 9).   After correspondence with Voya, Lincoln Life sent a revised recommendation on March 28, 2016.  (Doc. 139 ¶¶ 10–11).  Following a review by a Voya team of the proposed increase, Voya's management recommended that the proposed adjustment to the COI Rate be approved by Voya's board of directors.  (Doc. 139 ¶ 14).  On April 7, 2016, Voya's board of directors approved the proposed increase, which was then announced on May 9, 2016. (Doc. 139 ¶¶ 15–16; Doc. 149 ¶ 34).  On June 1, 2016, Voya implemented the approved adjustment to the COI Rate on the policies held by members of the certified class (the "2016 COI Adjustment").  (Doc. 149 ¶¶ 38–39).  The certified class excludes New York residents who hold otherwise included policies because, prior to the implementation of the 2016 COI Adjustment and following the opening of an investigation by the New York Department of Financial Services

("NYDFS"), Voya postponed and still has not implemented the approved increase to the COI Rate for New York policyholders.  (Doc. 149 ¶¶ 35, 38–39).

The 2016 COI Adjustment increased the COI Rate for Voya's universal life or variable universal life insurance product lines.  (Doc. 139 ¶ 17; Doc. 149 ¶ 34).  The policyholders of each product type were to receive the same percentage increase in the COI Rate, except for New York policyholders who were exempted from the 2016 COI Adjustment following the initiation of NYDFS's investigation.  (Doc. 139 ¶ 17; Doc. 149 ¶¶ 26, 39).  Some members of the certified class did not receive the full 2016 COI Adjustment as the contractual maximum COI Rate specified in that class member's policy capped the increase.  (Doc. 139 ¶ 18; Pl.'s Ex. 11 ¶ 46 (Doc. 143-6)).

On August 11, 2016, Hanks filed suit, alleging that the 2016 COI Adjustment constitutes a breach of the COI Rate section of her Policy and asserts three theories to support the alleged breach.  Hanks argues that Voya (1) did not implement the 2016 COI Adjustment "on a class basis";[2] (2) did not implement the 2016 COI Adjustment "on a uniform basis"; and (3) did not rely on Voya's "estimates for future cost factors" when calculating the implemented 2016 COI Adjustment.  (Doc. 1; Doc. 141 at 1–5).  Each side has moved for summary judgment on the breach of contract claim.

LEGAL STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A dispute regarding

---

[2] As used here, the word "class" does not refer to the class certified under Rule 23, Fed. R. Civ. P., but to language of the Policy that requires that adjustments to the COI Rate be "on a class basis," a term that will be construed by the Court.

6

a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (quoting Lunds, Inc. v. Chem. Bank, 870 F.2d 840, 844 (2d Cir. 1989)).

DISCUSSION

Voya moves for summary judgment on the grounds that it has not breached the Policy.  Hanks cross-moves for summary judgment, putting forth the aforementioned three theories under which Voya has breached the Policy.  Both sides disclaim reliance on extrinsic evidence and argue that the unambiguous words of the Policy are sufficient to grant summary judgment in their respective favor.  (Doc. 134 at 1–2; Doc. 151 at 2–3).  For the reasons that follow, Voya's motion will be granted in part and Hanks' motion will be denied.

I. Hanks' Policy Is Governed by Texas Law.

"A federal court sitting in diversity applies the choice-of-law rules of the forum state." Md. Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 151 (2d Cir. 2003) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)).  "The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." Id. (quoting In re Allstate Ins. Co. and Stolarz, 81 N.Y.2d 219, 223 (1993)).  Insurance policies are a species of contract and are governed by the rules of contract interpretation. Frazer Exton Dev., L.P. v. Kemper Envtl., Ltd., 153 Fed. App'x 31, 32 (2d Cir. 2005) ("Insurance policies are contracts and are therefore interpreted according to the rules of contract interpretation.").  Therefore, if a conflict of laws exists and the applicable substantive law must be determined for a disputed insurance contract, "New York applies a 'grouping of contacts' theory to contract claims," which aims "to establish which State has the most significant relationship to the transaction and the parties." Schwartz v. Liberty Mut. Ins. Co., 539 F.3d 135, 151 (2d Cir. 2008).

"Along with 'the traditionally determinative choice of law factor of the place of contracting,' the New York Court of Appeals has endorsed the following factors (identified in the Restatement):  'the places of negotiation and performance; the location of the subject matter; and

8

the domicile or place of business of the contracting parties.'" Id. at 151–52 (quoting Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 318 (1994)). "In the insurance law context, New York recognizes the precept that a court should apply 'the local law of the state which the parties understood was to be the principal location of the insured risk . . . unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties.'" Id. at 152 (quoting Restatement (Second) of Conflict of Laws § 193 (1971)).

In this case, the sole question of law is whether Voya breached the Policy and other life insurance policies held by certified class members in its implementation of the 2016 COI Adjustment. The life insurance policies of certified class members, which were issued nationwide, implicate the laws of Puerto Rico, the District of Columbia, and every state except for New York as New York policyholders are not included in the class. As discussed in this Court's opinion on class certification, (Doc. 110 at 11), the parties agree that the law of breach is materially uniform across state jurisdictions, meaning that there are no actual conflicts of law. In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 127 (2d Cir. 2013) ("[S]tate contract law defines breach consistently such that the question will usually be the same in all jurisdictions."); see also Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 233 n.8 (1995) (stating that "contract law is not at its core 'diverse, nonuniform, and confusing'" (quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 529 (1992) (plurality opinion))). Because New York substantive law is not relevant to any pending claims, the Court will use the substantive law of Texas to analyze the alleged breach. Texas represents the principal location of the insured risk and the state with the most significant relationship with Hanks' Policy as she purchased the Policy in Texas and is domiciled in Texas.

Under Texas law, "[t]he essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach

of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." Mullins v. TestAmerica, Inc., 564 F.3d 386, 418 (5th Cir. 2009); see also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004). An insurance contract is "guided by the well-established principles of contract construction." State Farm Lloyds v. Page, 315 S.W.3d 525, 527 (Tex. 2010). "When interpreting contracts, courts applying Texas law must strive to ascertain the parties' intent as expressed in the written instrument." Mullins, 564 F.3d at 404. The Court's analysis "is confined within the four corners of the policy itself" and "must read all parts of the contract together, giving effect to each word, clause, and sentence, and avoid making any provision within the policy inoperative." Page, 315 S.W.3d 527. "If the wording of the instrument can be given a definite or certain meaning, then it is not ambiguous and must be construed as a matter of law." Mullins, 564 F.3d at 404; see also Nat'l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995) ("If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous."); TIG Ins. Co. v. N. Am. Van Lines, Inc., 170 S.W.3d 264, 268 (Tex. App. 2005) ("If the contract can be given an exact or certain legal interpretation, it is not ambiguous, and we must interpret the insurance policy's meaning and intent from its four corners."). "Parol evidence is not admissible for the purpose of creating an ambiguity." CBI Indus., Inc., 907 S.W.2d at 520.

"If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous." Id.; see also Mullins, 564 F.3d at 404 ("If, however, 'its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning, taking into consideration circumstances present when the particular writing was executed, then it is ambiguous and its meaning must be resolved by a finder of fact." (internal citations and quotation marks omitted)). Further, ambiguity must be resolved "by adopting the construction that

most favors the insured." Nat'l Union Fire Ins. Co. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex. 1991); see also Sharp v. State Farm Fire & Cas. Ins. Co., 115 F.3d 1258, 1260–61 (5th Cir. 1997) ("It is well-established that ambiguities in insurance contracts are to be strictly construed against the insurer."). "Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument." CBI Indus., Inc., 907 S.W.2d at 520 (internal citations omitted).

II.   Voya Did Not Breach the "On a Class Basis" Requirement of the Policy.

Hanks alleges that Voya breached the Policy by implementing the 2016 COI Adjustment in violation of the Policy's requirement that adjustments to the COI Rate be made "on a class basis." Voya argues that 2016 COI Adjustment was not a breach of this provision.

Under her first theory of breach, Hanks argues the 2016 COI Adjustment did not comply with the requirement that "[a]djustments will be on a class basis," which is contained in the second paragraph of COI Rate section. (Doc. 136-3 at 7). Hanks asserts that "class," as used in this paragraph, must be interpreted in light of a sentence in the first paragraph of the COI Rate section, which initially calculates "[t]he Monthly Cost of Insurance . . . based on the Insured's sex, attained age and premium class." (Doc. 136-3 at 7). Hank contends that, because the initial COI Rate had to be determined based on her "sex, attained age and premium class," the definition of "class" in the second paragraph is limited to encompass only these three characteristics. (Doc. 141 at 3, 21). Accordingly, Hanks argues that, for any adjustment to the COI Rate to be made "on a class basis," the adjustment must be calculated based only on "sex, attained age and premium class."

Voya agrees that the Policy requires any adjustment to the COI Rate be done "on a class basis." (Doc. 134 at 5; Doc. 148 at 26). However, Voya argues that the phrase "on a class basis" does not require grouping policyholders based only on "sex, attained age and premium

class." (Doc. 134 at 5; Doc. 148 at 26). Voya asserts that, as "class" is not specifically defined in the Policy, the language of this provision gives Voya discretion to create classes for an adjustment to the COI Rate based on sets of common characteristics among the policyholders, whether those groupings be based on "sex, attained age and premium class," product line, or some other specific cost or risk factor. (Doc. 148 at 24–26, 28). The parties agree that the 2016 COI Adjustment was implemented by grouping policyholders according to product lines. (Doc. 139 ¶ 17). As such, Voya argues that has it complied with the "on a class basis" requirement because the 2016 COI Adjustment imposed differential increases on policyholders by product line classes, the creation of which for the purposes of a rate adjustment fell within the Policy's grant of discretion. Accordingly, Voya maintains that it did not breach the Policy as a matter of law and is entitled to summary judgment.

The phrase "on a class basis" is the only instance of the unmodified word "class" appearing in the Policy.[3] Nowhere in the Policy is "class" defined to mean "the Insured's sex, attained age and premium class." In order to impose its preferred contract-specific definition of "class," Hanks argues that "sex, attained age and premium class" appears five sentences prior to "class" so must act to modify "class." However, no language explicitly links these listed characteristics to "class" and mere proximity is insufficient to define "class" without more. Not only do "sex, attained age and premium class" and "class" appear in different paragraphs but they appear in relation to two distinct concepts: the determination of the initial COI Rate and subsequent adjustments to this base COI Rate. Further, Hanks' position requires the Court to

---

[3] Hanks' argument that the other use of "class" in the Policy, appearing in the term "premium class," demonstrates that "class" is limited to "sex, attained age and premium class" is inapposite. (Doc. 141 at 27–28). "Premium class" is a term with a specific meaning within the Policy, indicating whether the policyholder was a smoker or nonsmoker, (Doc. 136-3 at 3), and sheds no light on the meaning of the unmodified and otherwise undefined word "class." There is also a certain illogic to defining "class" as meaning any of three characteristics one of which is "premium class." Hanks' construction would necessarily apply to the word "class" in the phrase "premium class," giving it the circular meaning of "sex, attained age or premium class."

disregard that the Policy's drafters both created defined terms elsewhere in the Policy and spelled out "sex, attained age and premium class" in the first paragraph of the COI Rate section, but chose to neither define "class" or list "sex, attained age and premium class" in the second paragraph of the COI Rate section.

The Court declines to impose a limitation not required by the plain language of the Policy. Principles of contract interpretation do not permit the Court to take such a step. Pan Am Equities, Inc. v. Lexington Ins. Co., 959 F.3d 671, 674 (5th Cir. 2020) ("We must honor plain language, reviewing policies as drafted, not revising them as desired."); In re Davenport, 522 S.W.3d 452, 457 (Tex. 2017) ("Courts may not rewrite the parties' contract, nor should courts add to its language.").

"[C]lass" will be given its generally accepted meaning as required by the rules of contract interpretation. Landmark Am. Ins. Co. v. Lonergan Law Firm, P.L.L.C., 809 Fed. App'x 239, 241 (5th Cir. 2020) ("Unless the policy dictates otherwise, [courts] give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." (alteration in original) (quoting Nassar v. Liberty Mut. Fire Ins. Co., 508 S.W.3d 254, 257 (Tex. 2017))). The generally accepted meaning of an undefined word may be ascertained in the first instance by reference to dictionaries. In re Davenport, 522 S.W.3d at 457 ("Courts may look to dictionaries to discern the meaning of a commonly used term that the contract does not define."). Black's Law Dictionary defines "class" as "[a] group of people, things, qualities, or activities that have common characteristics or attributes." Black's Law Dictionary (11th ed. 2019). More specifically, "class," as used in the insurance context, is defined as a "group of insureds with the same characteristics, established for rate-making purposes." Harvey W. Rubin, Dictionary of Insurance Terms at 87 (4th ed. 2000).

The generally accepted and industry specific definitions of "class" make the plain meaning of the "on a class basis" requirement clear. The Policy only requires that Voya set adjustments to the COI Rate based on "group[s] of insureds with the same characteristics."

The discretion inherent in such a definition of "on a class basis" aligns with the parties' intent as expressed in the Policy. The Policy, a universal life insurance policy, differentiates itself from traditional whole and term life insurance products through its flexibility over time. Specifically, this definition of "class" would provide Voya with greater flexibility in addressing varying situations over the course of the decades (an actual lifetime) that the Policy is in-force than would the limited definition of "class" advanced by Hanks. Especially as the Policy's base COI Rate would still reflect differences of "sex, attained age and premium class," granting Voya discretion to adjust the COI Rate to account for costs not uniquely affected by these characteristics, such as the prevailing market rate of return, is a reasonable interpretation of the parties' intent as expressed in the Policy and of the Policy's underlying economic considerations. Accordingly, based on all of these factors, the Court concludes that the "on a class basis" requirement is not ambiguous and interprets it as a matter of law to mean a group of insureds with the same characteristics for rate-making purposes.

Hanks' claim of breach of the "on a class basis" requirement turned on whether the definition of "class" was restricted to "sex, attained age and premium class." There is no dispute of material fact that, if the definition of "class" was not restricted as Hanks contends, Voya's grouping of policies into product line classes did not violate the "on a class basis" requirement. The Court concludes that, on the evidence presented on the motion, no reasonable fact finder could conclude that Voya breached the "on a class basis" requirement of the Policy by implementing the 2016 COI Adjustment on the basis of product line classes. The Court will grant Voya's motion

for summary judgment on this theory of alleged breach and will deny Hanks' motion for summary judgment on this theory.

III.     Voya Did Not Breach the "On a Uniform Basis" Requirement of the Policy.

   Hanks next alleges that Voya breached the Policy by implementing the 2016 COI Adjustment in violation of the Policy's requirement that adjustments to the COI Rate be made "on a uniform basis."  Voya again argues that 2016 COI Adjustment was not a breach of this provision.

   Hanks' second theory of breach is that the 2016 COI Adjustment failed to comply with the requirement that "[a]ny adjustments will be made on a uniform basis." (Doc. 136-3 at 7). Hanks asserts that "on a uniform basis" requires any adjustment to the COI Rate be implemented consistently across each rate-making class. (Doc. 141 at 15).  Hanks contends that Voya prepared the 2016 COI Adjustment using product line classes and thereafter cancelled or deferred this adjustment for New York policyholders but imposed the adjustment for each rate-making class's non-New York members. (Doc. 141 at 15).  As members of the product line classes did not receive the same rate adjustment as all other members of their respective class, receiving either the full 2016 COI Adjustment or no adjustment at all, Hanks argues that the 2016 COI Adjustment was not implemented "on a uniform basis" and therefore breached the terms of the Policy. (Doc. 141 at 15).

   Voya advances two arguments as to why the 2016 COI Adjustment did not breach the Policy's "on a uniform basis" requirement.  First, Voya argues that "on a uniform basis" only requires that individual policyholders are not singled out for individual COI Rate adjustments and instead are treated in the same manner as other class members. (Doc. 134 at 24).  As no individuals were singled out for differential treatment, Voya contends that the 2016 COI Adjustment complied with the terms of the Policy.  Second, Voya asserts that the actions of NYDFS caused New York policyholders to become differentially situated from the other policyholders in their initial product

15

line class.  (Doc. 148 at 39).  To account for NYDFS's actions, Voya spilt New York policyholders into separate rate-making classes from non-New York policyholders of the same product type. Therefore, the difference in the 2016 COI Adjustment for New York and non-New York policyholders of the same product type was inter-class discrimination, which is permissible under the "uniform basis" requirement.  (Doc. 148 at 39).  Accordingly, under either theory, Voya contends that it did not breach the Policy and is entitled to summary judgment.

The Court again begins with the plain words of the Policy.  Hanks' policy states that any adjustment to the COI Rate "will be made on a uniform basis."  (Doc. 136-3 at 7).  Some policies in the certified class use "non-discriminatory" instead of "uniform" for this contractual requirement, but both parties agree that, "[i]n industry usage, there is no difference between 'uniform' and 'non-discriminatory.'"  (Pl.'s Ex. 2 at 37 n.108 (Doc. 143-2); Doc. 141 at 14 n.46; Doc. 134 at 24).  The Policy itself does not define either "uniform" or "non-discriminatory," so the Court will again look to dictionaries to ascertain the commonly used meaning of these terms. Black's defines "uniform" as "[c]haracterized by a lack of variation; identical or consistent." Black's Law Dictionary (11th ed. 2019).  Black's does not define "non-discriminatory" but defines "discrimination" in relevant part, as "[d]ifferential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." Black's Law Dictionary (11th ed. 2019).  An industry-specific dictionary does not define "uniform," but defines "discrimination" as the "failure of an insurance company to offer similar insurance coverages at comparable premium rates to all individuals or groups with the same underwriting characteristics."  Rubin, Dictionary of Insurance Terms at 139.

Construing the plain language in light of industry usage and meaning, "on a uniform basis" prohibits Voya from implementing a COI Rate adjustment that treats "groups with the same

underwriting characteristics" differently.  This construction respects the plain language of the provision and gives meaning to the entirety of the Policy.  Further, the Court's construction comports with the similar provisions of Texas law.  Tex. Ins. Code Ann. § 544.052–053 (West 2019) (barring "discrimination between individuals of the same class and of essentially the same hazard" with the exception of "the charging of an individual a rate that is different from the rate charged another individual for the same coverage [if] based on sound actuarial principles").  The parties themselves agree with the Court's construction, which amounts to a mandate barring the implementation of a differential rate within a class, i.e. intra-class discrimination, but permitting differential rates between classes, i.e. inter-class discrimination.  In sum, the Court holds that the "on a uniform basis" requirement permits inter-class discrimination during adjustments to the COI Rate, but prohibits intra-class discrimination during such adjustments.

But the Court's construction of the Policy's "on a uniform basis" requirement does not settle the question of breach.  Hanks contends that the 2016 COI Adjustment represents intra-class discrimination as it applied to non-New York policyholders but not similarly situated non-New York policyholders and, therefore, is a breach of the "on a uniform basis" requirement. (Doc. 141 at 1).  Voya responds that it did not violate the "uniform basis" requirement by implementing the 2016 COI Adjustment only for non-New York policyholders.  Voya asserts that the actions of NYDFS created different underwriting characteristics between New York and non-New York members of the original product line classes.  (Doc. 148 at 38–39).  Voya argues that it accounted for these newly different underwriting characteristics by functionally subdividing the original classes into product line and jurisdiction classes and then implementing the 2016 COI Adjustment based on these new classes, which resulted in each member of each new class receiving an identical COI Rate adjustment as required by the "on a uniform basis" provision.

17

Accordingly, two questions remain.  The first question is whether the actions of NYDFS created different underwriting characteristics for New York and non-New York members of the product line classes, justifying the formation of distinct classes.  The second question concerns Voya's timing in subdividing the product line classes into product lines and jurisdiction classes.  The parties agree that when the 2016 COI Adjustment was modeled and then approved by Voya's board of directors, it was based on product line classes.  Only after the initiation of NYDFS's inquiry, shortly before the implementation of the 2016 COI Adjustment, did Voya exempt New York policyholders from the adjustment.  Hanks essentially asserts that Voya could not change the classes upon which the 2016 COI Adjustment was based at such a late stage and, therefore, the 2016 COI Adjustment impermissibly applied a different rate adjustment to members of the same class.

On the first question, the Court concludes, based on the undisputed facts, that the actions of NYDFS created different underwriting characteristics between New York and non-New York policyholders, thereby providing a legitimate basis for the treatment of these groups as separate classes.  The parties have submitted evidence showing that, in letters to Voya, NYDFS stated its belief that the 2016 COI Adjustment was a violation of New York State law.  (Pl.'s Ex 49 at 3 (Doc. 149-27); Pl.'s Ex. 50 at 2 (Doc. 149-28)).  Voya asserts that the potential state penalties threatened by NYDFS comprised a set of "special risks or costs" unique to the policies under the purview of NYDFS, namely the New York policies.  (Doc. 134 at 24–25 (citing Doc. 143-2 ¶ 66); Pl.'s Ex. 18 at 283:9–19 (Doc. 143-12); Pl.'s Ex. 20 at 16:20–17:18 (Doc. 143-14) (stating that NYDFS had said "that they were potentially going to fine Voya a thousand — $10,000 per incident if they don't make a change or if they don't hold off on the cost of insurance change")).  Hanks replies that a non-final objection from NYDFS does not create differing underwriting

characteristics between New York and non-New York policyholders and, as such, there was no "actuarially fair" basis for differential treatment of these members of the same classes.

Treatment "on a uniform basis" has been construed to mean consistent treatment of policyholders with the same underwriting characteristics. So, for example, documented histories of smoking or substance abuse could legitimately give groups of insured different underwriting characteristics. This is because the costs of providing coverage to such groups, and, therefore, the associated risk to the insurer, are much higher than the costs of providing comparable coverage to otherwise similar groups. In this case, the undisputed evidence shows that the position taken by NYDFS changed the risk profile of New York policyholders. Specifically, after NYDFS's actions, policies held by New York residents presented a unique risk of incurring regulatory and legal costs, including potential fines of $10,000 per policy. The costs of the differing regulation between New York and other states changed the comparative risk profile of New York policyholders and, therefore, represented a legitimate common characteristic for the creation of rate-making classes. Accordingly, due to this change in underwriting characteristics, the Policy permitted New York resident policyholders and non-New York resident policyholders to be treated as distinct classes by the 2016 COI Adjustment.

Further, there is nothing in the Policy that requires Voya to treat final and non-final agency action differently for the purposes of a COI Rate adjustment. While a difference exists in the certainty of final and non-final agency actions, non-final actions can still impose significant legal or regulatory risks and costs. As such, under the Policy, there is no reason that Voya must view non-final agency action differently from final agency action when evaluating the associated risks and costs. The Policy does not require Voya abdicate its business judgment or incur actual

legal liability before it is permitted to account for the potential costs of NYDFS's non-final regulatory action.

Though NYDFS has not made a final determination, accounting for the costs of NYDFS's potential action and adjusting the 2016 COI Adjustment as a result represents a valid exercise of Voya's business judgment. The Policy could have but does not bar Voya from adjusting its course of action to account for or minimize the legal risk of which it has received explicit notice. Accordingly, the Court determines that the effects of NYDFS's non-final position constitute a legitimate basis on which to create distinct underwriting classes of non-New York and New York policyholders.

On the second question, as discussed above, unique state regulations governing the policyholders' contracts are a legitimate basis for the creation of rate-making classes of policyholders. The Policy is, however, silent as to the point at which classes must be established, lacking language detailing requirements for the process by which classes are created and for the modeling of any COI Rate adjustments. The Policy simply states that the adjustment must be made "on a class basis," referencing only the fact of adjustment being implemented rather than any preparatory process. The plain words of the Policy do not bar Voya from recalibrating the classes upon which the 2016 COI Adjustment was based prior to its implementation. Accordingly, the Court concludes that the timing of Voya's change from product line classes to product line and jurisdiction classes did not violate the "on a uniform basis" requirement of the Policy.

\* \* \*

The Court will grant Voya's motion for summary judgment dismissing the "on a uniform basis" theory of breach and will deny Hanks' motion for summary judgment on this theory.

IV.    Disputed Issues of Fact Remain as to Voya's Alleged Breach of the "Aetna's Estimates for
       <u>Future Cost Factors" Provision of the Policy</u>.

Hanks alleges that Voya breached the Policy by implementing the 2016 COI
Adjustment in violation of the Policy's requirement that adjustments to the COI Rate be "based on
Aetna's estimates for future cost factors, such as mortality, investment income, expenses and the
length of time policies stay in force."  (Doc. 136-3 at 7).  Hanks asserts that she is entitled to
summary judgment on her claim of breach because Voya used Lincoln Life's 1998 profitability
estimates, rather than its own estimates, when setting new COI Rates for the 2016 COI Adjustment.
(Doc. 141 at 30–31).  Hanks also asserts that there are genuine disputes of fact as to Voya's
compliance with the entirety of this provision, specifically whether the current estimates of cost
factors were Voya's estimates, Voya compared current estimates to original assumptions, and
Voya's estimates were based on profits rather than cost factors alone.  (Doc. 141 at 32–42).

Voya interprets the Policy provision at issue to "require[] a [cost of insurance]
adjustment to be based on the insurer's forward-looking projections of the in-force Policies' cost
factors."  (Doc. 148 at 9).  As such, Voya asserts that the estimates used to set the 2016 COI
Adjustment were its own because, though the estimates at issue were initially created by Lincoln
Life, which was bound by an agency agreement with Voya to carry out such work, they were then
formally adopted by Voya prior to and through the implementation of the 2016 COI Adjustment.
Therefore, Voya maintains that the 2016 COI Adjustment was based on its estimates as required
and that it did not breach the "Aetna's estimates" provision of the Policy.  Further, Voya contends
that there are no outstanding disputes of material facts as to Hanks' remaining allegations of
breach.  Because Voya argues that it did not breach the Policy in any manner, it asserts that its
motion for summary judgment should be granted.

21

Voya's interpretation is consistent with the words of the Policy. The Policy's terms simply require that any adjustment to the COI Rate be based on future cost projections for the policies at issue.[4] The Court determines that the Policy requires any COI Rate adjustment be based on Voya's forward-looking projections of the in-force policies' cost factors, which include but are not limited to mortality, investment income, expenses, and the length of time policies stay in force.

Based on the undisputed facts in the record, the Court finds that the estimates, whether baseline or current, used to set the 2016 COI Adjustment were Voya's estimates. There is no dispute as to the manner in which the 2016 COI Adjustment was formulated, adopted, and approved. The parties agree that Lincoln Life, Voya's duly appointed administrative agent for the class policies, (Doc. 148 at 3; Doc. 139 at 22), selected, created, and revised the estimates upon which the 2016 COI Adjustment were set, (Doc. 139 ¶¶ 9–11). The parties further agree that these estimates, as part of Lincoln Life's recommendation regarding increasing the COI Rate, were sent to Voya, which reviewed them and corresponded with Lincoln Life about them. (Doc. 139 ¶¶ 9–11). The parties agree that Voya's management accepted the final estimates and made the final decision to set the 2016 COI Adjustment based on them. (Doc. 139 ¶¶ 14–15). The parties agree that Voya's board of directors approved the 2016 COI Adjustment with knowledge that this adjustment incorporated Lincoln Life's estimates. (Def.'s Ex. 9 at 4–6 (Doc. 136-9); Doc. 139 ¶ 15; Doc. 141 at 34).

Based on these facts, the remaining question is whether the estimates formulated by Lincoln Life became Voya's estimates through the process of adopting and implementing the 2016 COI Adjustment. Voya contends that, through this process, in which it reviewed, discussed, and adopted by formal board action its agent's recommendation, the estimates upon which the

---

[4] Voya's addition of "in-force" is logical as policies that have been redeemed, lapsed, or otherwise are no longer valid do not have any future costs to estimate.

recommendation was based became its' own.  Hanks, in contrast, argues, that Voya's adoption of these estimates was "generic" and a "rubberstamp."  (Doc. 141 at 31, 33; see also Doc. 151 at 16–20).

The plain language of the Policy simply requires that the estimates be Voya's estimates.  Established principles of law permit an insurer to adopt as its own estimates developed by its agent or by other third parties.  See, e.g., 3 Couch on Ins. § 44:49–56 (3d ed. 2020); Restatement (Third) Of Agency § 4.01–06 (2006).  The Policy terms do not bar Voya from evaluating and, if appropriate, accepting another's estimates.  Voya's actions are not materially different from an insurer retaining an actuary or accountant to develop estimates, then scrutinizing and deciding to accept them.  The undisputed facts show that Voya reviewed, considered, and adopted Lincoln Life's estimates as its own and used them to implement the 2016 COI Adjustment.  Hanks' argument fails to identify any standard or procedure, embodied in the language of the Policy, by which Voya's adoption of the Lincoln Life's recommendation and estimates failed to abide.  Hanks asks the Court to read into the Policy limitations that do not otherwise exist, which the Court will not do.  In re Davenport, 522 S.W.3d at 457.

Based upon the undisputed facts, the Court concludes that Voya based the 2016 COI Adjustment on its own independent review, consideration, and adoption of Lincoln Life's estimates, satisfying the requirements of the Policy.  The Court will deny Hanks' motion for summary judgment on this theory of breach.

But the Court finds genuine disputes of material fact as to Hanks' contention that the 2016 COI Adjustment was calculated based "on impermissible profit factors."  This Hanks alleges was done in order to remedy Lincoln Life's disappointing returns from the 1998 reinsurance indemnity transaction.  (Doc. 141 at 13, 39–41).  Hanks further asserts that the

rationale underlying the 2016 COI Adjustment was "profit-driven," failing to consider actual costs of insurance, and resulted in profits at a level exceeding that anticipated when the class policies were originally sold.  (Doc. 141 at 40–41).  Voya replies that the 2016 COI Adjustment was based on permissible cost factors and that references to profits were in the context of costs' effects on profits.

COI Rate adjustments may only be based on estimates of future cost factors, which can include but are not limited to mortality, investment income, expenses, and the length of time policies stay in force.  Accordingly, the rate increase embodied in the 2016 COI Adjustment should have been based on increases in the costs associated with the in-force policies.  Implementing an increase in the COI Rate in order to raise profits without an analysis of relevant cost factors would violate the terms of the Policy.  However, costs fundamentally have an effect on profits, which, generally speaking, are a measure of revenues minus costs.  Consideration of spiraling costs is appropriate and these rising costs may also be reflected in a deteriorating profit margin.

Here, an issue of material fact remains as to whether the 2016 COI Adjustment was based on analysis of cost factors related to the in-force polices as mandated by the terms of the Policy or was based on Lincoln Life's profitability goals.  Hanks puts forth evidence and expert opinions supporting its position that the 2016 COI Adjustment was based not on an evaluation of future cost factors, but was implemented on the basis of improper considerations with the aim of "increas[ing] anticipated future profitability."  (See, e.g., Doc. 138 ¶¶ 20–23; Pl.'s Ex. 2 ¶¶ 21, 83–98, 110 (Doc. 143-2)).  Voya disputes this evidence and has come forward with evidence and expert opinions tending to show that contractually proper future cost factors were the basis of the 2016 COI Adjustment.  (See, e.g., Doc. 135 ¶¶ 13, 20–21; Def.'s Ex. 11 ¶¶ 140–57 (Doc. 136-6)).

But at bottom these are disputed issues of material fact and the Court will deny Voya's motion for summary judgment.

CONCLUSION

The Court denies Hanks' motion for summary.  The Court grants Voya's motion for summary judgment in part, finding no breach of the Policy on the "class basis" or "uniform basis" theories of breach.  The Court concludes there are genuine issues of material fact on the "estimates of future cost factors" theory of breach and denies Voya's motion for summary judgment on that theory.  The Clerk is directed to terminate these motions.  (Docs. 133, 137).  The Clerk is also directed to modify the case caption to reflect the caption used in this Opinion and Order.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:  New York, New York
        September 29, 2020