# EXHIBIT 5

L5CGHANC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  HELEN HANKS, on behalf of
   herself and all others
4  similarly situated,

5              Plaintiffs,

6        v.                              16 Civ. 6399 (PKC)

7  VOYA RETIREMENT INSURANCE AND
   ANNUITY COMPANY, formerly
8  known as Aetna Life Insurance
   and Annuity Company,
9                                        Conference

10             Defendant.

11 ------------------------------x
                                        New York, N.Y.
12                                      May 12, 2021
                                        12:40 p.m.
13
   Before:
14
                   HON. P. KEVIN CASTEL,
15
                                        District Judge
16
                        APPEARANCES
17
   SUSMAN GODFREY LLP
18       Attorneys for Plaintiffs
   BY:  STEVEN G. SKLAVER
19       NICHOLAS N. SPEAR
         SETH D. ARD
20
   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
21       Attorneys for Defendant
   BY:  MOTTY SHULMAN
22       ROBIN HENRY
         GLENN L. RADECKI
23
   BOIES, SCHILLER  FLEXNER LLP
24       Attorneys for Defendant
   BY:  JOHN F. LA SALLE, III
25

L5CGHANC

```
 1          (In open court)
 2          THE DEPUTY CLERK:  This is the case of Helen Hanks v.
 3   Voya Retirement Insurance and Annuity Company.
 4          For the plaintiff?
 5          MR. SKLAVER:  Good afternoon, your Honor.  Steven
 6   Sklaver of Susman Godfrey for the plaintiff and the class.
 7          THE COURT:  Good afternoon.
 8          And also appearing?
 9          MR. ARD:  Good afternoon, your Honor.  Seth Ard from
10   Susman Godfrey for the plaintiff and the class.
11          MR. SPEAR:  Good afternoon, your Honor.  Nick Spear
12   from Susman Godfrey for the plaintiff and the class.
13          THE COURT:  Good afternoon to all of you.
14          And for the defendant, Voya?
15          MR. SHULMAN:  Good afternoon, your Honor.  Motty
16   Shulman with Fried, Frank for Voya.
17          MS. HENRY:  Robin Henry, also from Fried, Frank, also
18   for Voya.
19          MR. LA SALLE:  John La Salle, Boies Schiller Flexner
20   for defendant Voya.
21          THE COURT:  Good afternoon to you all.
22          I have spent time visiting with the final pretrial
23   submissions, the in limine motions, the joint pretrial order.
24   The case, of course, is now down to the following:  The
25   argument that the COI rate was adjusted on other than estimates
```

L5CGHANC

1    for future cost factors, such as mortality, investment income,

2    expenses, and the length of time policies stay in force.  The

3    policy language has been argued to be unambiguous.  The Court

4    concludes it's unambiguous.  The estimates for future cost

5    factors is followed by the term "such as," these are examples,

6    it's nonexclusive.  Mortality, investment income, expenses, and

7    the length of time policies stay in force are included among

8    proper items to be included in an estimate for future cost

9    factors, but they're not exhaustive.

10       A lot of time is spent in the *in limine* motions on

11   issues that should be self-evident.  No expert in this case is

12   going to be able to take the witness stand and opine on the

13   meaning of the contract, the construction of the contract.

14   That will not happen.

15       There is a question with regard to custom and usage

16   under Texas law.  And under Texas law, as under the law in many

17   jurisdictions, custom and usage, trade usage can be used not to

18   alter or vary the terms of a contract, but to shed light on how

19   a particular term is used in a particular industry.  And I may

20   wind up spending much of my time sustaining objections where

21   experts depart from that very limited role.

22       So let me begin with the plaintiffs' *in limine*

23   motions.  The first one relates to the guaranteed maximum cost

24   of insurance rate provision in the policy and urges exclusion

25   or reference to the guaranteed maximum COI rate.  Are the

L5CGHANC

1    parties content to rest on their submissions on that?

2              MR. SPEAR:  Yes, your Honor.

3              MR. SHULMAN:  Yes, your Honor.

4              THE COURT:  It seems to me that reference to the

5    guaranteed maximum COI rate provides helpful context,

6    background to the jurors on damages and calculation and on

7    liability.  Prejudice from having the jury become aware of this

8    is low.  It's right in the policy.  Of course, no one may argue

9    that the insurer had the right to bump up to the guaranteed

10   maximum COI rate, that that in essence is, by definition, the

11   lawful rate one may charge.  That's not what the policy says.

12   And if there is argument to that effect, the Court will shut it

13   down.

14             Next, expert testimony on legal interpretation of the

15   policy.  I've intimated where I'm going to come out on that.

16   Anything further from the plaintiffs?

17             MR. SPEAR:  No, your Honor.

18             THE COURT:  From the defendants?

19             MR. SHULMAN:  No, your Honor.

20             THE COURT:  So the plaintiffs' motion, as well as the

21   defendant's third motion *in limine*, which seeks to have the

22   plaintiffs' actuarial expert precluded from giving legal

23   interpretations, both of those are granted; the plaintiffs'

24   second and the defendant's third motion *in limine*.

25             Next, evidence that the state regulators did not

L5CGHANC

disapprove of COI increases, and plaintiff argues that the fact

that no state regulator other than arguably the New York

Department of Financial Services challenged the 2016 COI

increase is probative of nothing.  The defendant urges that or

has no issue with that being excluded, except it argues,

therefore, that no reference should be made to the New York

State Department of Financial Services' investigation.

Certainly, evidence of regulatory inaction in response to the

2016 COI increase is probative of nothing and is excluded on

grounds of relevance.  It doesn't directly address whether the

defendants breached the policy.  And I'll discuss the New York

State Department of Financial Services' investigation a little

bit later in discussing the second motion *in limine* by

defendants.

          The fourth motion raised by the plaintiffs relates to

speculative effects of defendants complying with the terms of a

policy, if found liable.  Anything further from the plaintiff?

          MR. SPEAR:  No, your Honor.

          THE COURT:  From the defendant?

          MR. SHULMAN:  No, your Honor.

          THE COURT:  Certainly, defendants ought to be and are

precluded -- and I don't understand that they intended to

argue -- but they are precluded from arguing that a finding of

damages would affect defendant's financial condition, period.

That's not a relevant consideration.  And that argument will be

L5CGHANC

precluded.  So to that extent, I'm granting the motion.  It's

sort of moot because I don't understand the defendants will be

offering such arguments.  In general, just as the plaintiffs,

to some extent, can stand up before a jury and say, this cost

of insurance provision protects my clients from being

overcharged, there's nothing wrong in general with the

defendants saying that provision enables my client to pay death

benefits.  They're the flip side of the same coin.  And if it's

an argument, in essence, for jury nullification because a

judgment would hurt the defendant, that's precluded.  But other

type of argument I'll take up on a case-by-case basis.

        The fifth argument, the fifth motion by defendant

refers to dismissed parties' claims -- I'm sorry, this is the

plaintiffs' fifth motion regarding dismissed parties claims,

theories, or discovery orders.  And the defendant doesn't

oppose the motion.  It only argues that if the Court admits

evidence regarding the New York inquiry, that the defendants

would then seek to introduce evidence on the claim basis and

uniform basis theories that have been dismissed from the case.

Well, I'll say right up front that both sides are precluded

from referring to dismissed claims, parties, and theories.

When I say "dismissed parties," the name Lincoln Life

undoubtedly will come up, Aetna will come up, that's not what

I'm referring to.  I'm talking about a reference to the fact

that an entity was a party to this litigation but is no longer

L5CGHANC

1    or a claim was asserted in the case but the judge tossed it

2    out.  That's absolutely precluded.

3            Plaintiff has moved *in limine* to preclude argument

4    regarding the engagement and fee arrangement with counsel, as

5    well as plaintiffs' counsel's motivation for filing the

6    litigation.  Certainly, that is not probative of any issue in

7    this case.  Now, I understand the defendants want to

8    cross-examine plaintiff Hanks and the fact that she showed the

9    policy to her son-in-law.  I don't know of what relevance her

10   showing it to her son-in-law is or her son-in-law showing it to

11   a plaintiff's lawyer.  I'm just not going to rule on the scope

12   of cross-examination at this juncture.  So the motion is

13   granted.  And if on cross-examination there is something in the

14   testimony that suggests that you should be allowed to

15   cross-examine, I will hear you and rule at that time.

16           Now, before we get to the damage *in limine*s, I've

17   looked at the defendant's *in limine* motions on issues other

18   than the experts, and it's sort of the flip side of the

19   argument that the plaintiffs advanced about raising the fact

20   that theories were dismissed in this case.  Plaintiff correctly

21   states that just because a theory of liability is out of the

22   case, it doesn't mean that there couldn't be evidence that

23   would have related to one or the other theory, dismissed

24   theory, the class basis theory, the uniform basis theory that

25   might otherwise be relevant in this case.  That's fine.

L5CGHANC

1    Anybody who thinks that you're going to blow it past me trying

2    to argue your case to the jury on the basis of a dismissed

3    theory of liability hasn't spent much time in my courtroom.

4    That won't be happening, and no one should worry about that.

5    Particularly in a civil case, I'm not at all shy to stop in the

6    middle of an examination of a witness or an argument or

7    presentation by counsel and make it plain to the jury what is

8    and is not in the case before them.  And I will not hesitate to

9    do so.

10            Now, with regard to the New York State investigation,

11    let me hear from the defendant.

12            MR. SHULMAN:  Thank you, your Honor.  This case has

13    nothing to do with New York.  None of the policyholders in this

14    case are in New York.  None of the class members are in New

15    York.  New York has no jurisdiction over the policies that are

16    in this case.  It has nothing to do with New York.  The issues

17    raised by the New York DFS were related to several issues, some

18    of which your Honor in his order on the motion for summary

19    judgment expressly found had nothing to do with the contract.

20    For example, the New York DFS was making arguments under New

21    York regulations relating to class basis.  Your Honor found

22    that the class basis claim that plaintiffs made, which mirrored

23    the DFS claim, was inconsistent with the contract.  So

24    injecting New York into this case, apart from the toxicity

25    associated with a regulator looking at this which is highly

L5CGHANC

```
 1   prejudicial, will also bring in all of those elements of the
 2   case that your Honor has found are not appropriate for this
 3   case, namely class basis.  It's hard, if not impossible, to
 4   pull those two apart.  And almost all of the evidence -- and we
 5   haven't seen anything that plaintiffs have presented -- is
 6   available in other documents with the other witnesses.  So New
 7   York over here is, A, not relevant; B, highly prejudicial.  And
 8   the evidence that they want to bring in about profitability or
 9   cost factors is available through other means.
10           THE COURT:  Let me hear from the plaintiff.
11           MR. SPEAR:  Your Honor, a couple of responsive points.
12   First, we are not, as your Honor said, seeking to bring in
13   NYDFS evidence that relates to dismissed claims.  So to the
14   extent NYDFS comments on class basis, we understand that's out,
15   and we have no intention of bringing it in.  Second, we're not
16   seeking to bring in NYDFS's legal conclusions.  For the same
17   reason that the regulatory inaction statement is out, we
18   understand that we should not be bringing in the fact that
19   NYDFS thought certain things, we understand that.
20           But there's a number of relevances to the NYDFS
21   evidence outside of those.  First, there's a number of
22   statements by Voya.  These are party communications that Voya
23   made describing specific aspects of the increase; what they
24   did, why they did it.  One thing that's relevant.  Second thing
25   that's relevant or second point on that, Voya's counsel said
```

L5CGHANC

1      it's impossible to disentangle these things, but Judge McMahon

2      did exactly this in *US Bank*.  And what Judge McMahon did was a

3      document-by-document analysis.  Every party communication from

4      the insurer she let in, she found them not prejudicial and

5      probative.  And for the insurer communications, she reviewed

6      them document by document.  And for the documents that she

7      found either didn't have hearsay or didn't have legal

8      conclusions, she let them in.  For the documents that had a

9      mix, she tried to either redact or use a limiting instruction.

10     And then for a few, she found they were so overwhelmingly

11     filled with legal conclusions, she excluded them.  That's

12     exactly the analysis the Court should do here.  And a problem

13     for defendants with that analysis is they don't, until their

14     reply brief, even analyze a specific document.  They talk all

15     in generalities.  So our position is that this should be left

16     to trial.  We can do it on a document-by-document issue, and

17     we're happy to walk through that at the appropriate time.  But

18     there's been no briefing on that, other than some statements in

19     reply.

20             And then the final point is for defendant's damages

21     model -- our damages model, we say it's the overcharge that

22     resulted from the increase.  Defendant says, no, no, no, it

23     should be what Voya would have done --

24             THE COURT:  Well, we're going to get to that.  We're

25     going to get to that.

L5CGHANC

1          MR. SPEAR:  So I'll just leave it and say that we

2     think it's probative in that aspect too.  So we would ask the

3     Court to look at a document-by-document analysis, we explain

4     why the few we identify are relevant.  Otherwise, these issues

5     should all be available.

6          MR. SHULMAN:  On the document-by-document analysis

7     issue, your Honor, I believe there are some documents that are

8     very straightforward and can be ruled on on a

9     document-by-document basis.  However, here is the concern with

10    some of the documents.  The New York DFS comes back to Voya and

11    says, we want you to do a following analysis, an analysis that

12    looks at this increase on a class basis and using a different

13    pricing model than Voya.  And they go ahead and they prepare

14    that analysis and they send it back to the DFS.  That analysis

15    has two different things that are separate.  One is the class

16    basis, and one is whether it was profitable more than

17    plaintiffs say we're allowed, less than plaintiffs say we're

18    allowed.  But once we start looking at analyses relating to the

19    DFS that have that class basis analysis in it, we've crossed

20    the line that can have a series of cascading events that will

21    bring in all those other things that your Honor just ruled has

22    to stay out of this case.

23         THE COURT:  Listen, I don't do well with the horror

24    scenario, oh, my goodness, okay.  This seems to me a question

25    of both sides deciding to deal with this as adults or not deal

L5CGHANC

1    with it as adults.  You might say, it's easier not to deal with

2    it, we'll throw it at the judge.  I don't think you want to do

3    that.  The fact of the matter is, statements by Voya to NYDFS

4    are potentially party admissions, party statements that come

5    into evidence if they're relevant.  If they disclose more than

6    is needed for the point of the party's statement about the

7    investigation, then that should be redacted out.  And the

8    redaction should be worked out between counsel ahead of time,

9    in terms of what you want to redact out.

10          Now, what I'm not going to do is allow into evidence

11   evidence that is not probative of the single question before

12   this jury but sounds like it has something to do with it.  If

13   you're being asked a question by the regulator on a different

14   subject and responding on a different subject, it's likely that

15   that will have nothing of probative value in it.  I can't

16   assess that wholesale, except in the context.  But you -- not

17   the junior member of your teams -- but the trial counsel are

18   going to be spending a lot of time on working out those

19   redactions, okay.

20          Let me talk about Christopher Hause.  There are a

21   number of issues, and I have spoken about some of them.  One of

22   them is that you could read Hause's testimony as suggesting

23   that there are actuarial principles that have been violated and

24   that standing alone is a breach of the policy.  That will not

25   be permitted.  We're dealing with the contract, not with

L5CGHANC

actuarial principles.  Actuarial principles may have relevance

to the evidence in this case, so that's the case, and it may

explain why something is or is not properly a future estimate

of cost.  So that testimony has to come out before I can rule

on it, what exactly it is that Hause is proposing to say.  But

if he is endeavoring to lay on a layer or a standard different

from that which is in the contract, that's not going to be

allowed.

          And that's true also with custom and practice.  Simply

sitting back in the chair and saying nobody includes this in

their COI rates doesn't address what this contract provides.

And he's not going to be allowed to do that.  If there is

something in the custom and usage and practice that does not

vary or modify but enlightens how the words are used in the

industry, that's a different story.  And of course, he's not

going to be permitted to testify on his opinion of whether Voya

did or did not comply with its contractual obligations.

          I'm not going to at this stage rule upon what Hause

may or may not say based on reinsurance issues.  It depends

on -- I have to hear his expertise and his experience, and I

will, so that I'm reserving on.

          With regard to plaintiffs' three motions related to

damages, the first relates to the substitution of David Babbel

with Craig Merrill.  And I don't mean to be unfair to anybody

here, but it looks to me that there is a distortion of what the

L5CGHANC

purpose and meaning of an expert report is. An expert report

is a disclosure device. It's a disclosure requirement to put

someone on fair notice of an expert's opinion on a subject and

the basis for the opinion. A variation or explanation in a

deposition does not mean that that which was testified to in

the deposition, including out-of-pocket damage theory, is off

limits. If anything, you learned about it in the deposition,

you got to cross-examine him. So I don't see where the

prejudice flows. And I am not going to preclude Merrill in

that regard. I also understand that the parties proposed to

supplement their damage data, including updating their expert

reports on damages. So maybe there's some other remedy the

plaintiff could seek, but I'm not precluding the testimony.

        Now, very interesting issue is hypothetical

alternative cost of insurance increases. And I'm not really

sure I know what the defendant is arguing. Certainly, if a

future estimate is made on what is a valid cost factor and the

estimate is too high, it does not mean that it is therefore

replaced by the number zero. That makes no sense. Measure of

damages is between, as I understand Texas law, what a party

bargained for and what they got. And if the increase was too

high, it doesn't mean that a lower increase would have been

appropriate or if the estimate was too high, it doesn't mean

that a lower estimate wouldn't have been appropriate. Where I

am less certain is whether the defendants are suggesting in

L5CGHANC

```
1    this case that they should be able to come up with new areas of
2    costs, new items that were not contemplated at the time and
3    say, well, if we go back and we were going to do this all over
4    again, these people left out A, B, C, and D, and so I want to
5    create a hypothetical universe that now allocates costs to A,
6    B, C, and D.  If that's permissible under Texas law, somebody
7    has to demonstrate that to me.  So what is the defendant
8    arguing here?
9              MS. HENRY:  Robin Henry, your Honor.
10             THE COURT:  Yes.
11             MS. HENRY:  What we are arguing, your Honor, is not a
12   setoff, which I think is the way the plaintiffs has
13   characterized it.  But rather, we are arguing that there is a
14   causation element on which the plaintiffs bear the burden of
15   proof.  They have to prove that some cost factor was improperly
16   considered and therefore caused damage to their clients.
17             THE COURT:  Can't they also show that a cost factor
18   was properly considered but at an inflated amount?
19             MS. HENRY:  I don't think that that's the argument
20   that's being made, your Honor.  What we're talking about
21   here --
22             THE COURT:  Let me pause on it because it would be
23   helpful to me.  Is it correct that that's not part of what
24   you're arguing?
25             MR. SKLAVER:  Well, your Honor, our argument is
```

L5CGHANC

1    consistent with the summary judgment order that the COI

2    increase imposed by Voya is based on Lincoln's profitability

3    goals.  So its profitability is what's at issue, not cost

4    factors.  What's happening here is the defendant is arguing,

5    let's imagine this hypothetical world where reinsurance, which

6    is one example, which is a pure profit grab for Lincoln --

7    remember, Lincoln is the reinsurer, they did this increase to

8    impact their reinsurance margins.  It's the reinsurance

9    company's reinsurance money that they're trying to get from the

10   class.  And our argument is that that's a profitability goal

11   for which there is a breach.  The defendant's argument is

12   there's some hypothetical world where let's take out that

13   reinsurance --

14           THE COURT:  Hang on a second, now.  You have read my

15   summary judgment decision and you've been around the block.

16   You understand that costs and profits are interrelated, no?

17           MR. SKLAVER:  The summary judgment order does say, of

18   course, that --

19           THE COURT:  I know it says it.  But you don't buy

20   that?  You don't agree with that?

21           MR. SKLAVER:  I'm not disagreeing with your statement.

22           THE COURT:  You agree with it?

23           MR. SKLAVER:  Sure.

24           THE COURT:  So if somebody says, this is outrageous,

25   our profits are going to zero because our costs have gone up

L5CGHANC

1   and we haven't adjusted the rates, is that a bad thing to say?

2   Is that a breach?  Is that a bad, impure thought?

3            MR. SKLAVER:  Well, that's not the issue in this case.

4   The issue in this case is that reinsurance is a profit center,

5   not a cost, right, it's pure profit that the reinsurer is

6   trying to recapture from members of the class.  And so the --

7            THE COURT:  Wait.  Let's just make this plain, because

8   it's being thrown around in different respects.  So Lincoln

9   Life, are you characterizing it as a reinsurer of Voya?  Is

10  that what you're characterizing it as?

11           MR. SKLAVER:  Yes, they are the hundred percent

12  indemnity reinsurer of Voya.

13           THE COURT:  You're not talking about Lincoln Life,

14  then, laying off the risk to other reinsurers, that's not what

15  you're referring to?

16           MR. SKLAVER:  Well, I'm also referring to that.

17           THE COURT:  All right.  So you're maintaining that

18  when a premium is ceded to a reinsurer, that's not a cost?

19           MR. SKLAVER:  So it depends on which reinsurer we're

20  referring to.  When Lincoln engaged in a reinsurance

21  transaction for this block, it was a profit center for Lincoln.

22  And they anticipated that there would be -- they wanted to make

23  more money off of that profit center in order to recover losses

24  that they were suffering based on the 1998 transaction in which

25  they became the reinsurer.

L5CGHANC

```
 1              THE COURT:  You just have to help me out here.  And I
 2    suspect this may be important in this case, so it's worth
 3    taking a minute or two.  Let's refer to Lincoln Life as Lincoln
 4    Life.  I understand the argument that the nature of the
 5    agreement between Voya and Lincoln Life has maybe a reinsurance
 6    transaction or not, but let's just call it Lincoln Life.
 7              When Lincoln Life cedes risk to a reinsurer, with that
 8    risk it cedes some of the premium that it would otherwise
 9    collect; right?
10              MR. SKLAVER:  It can pay money.  I don't know if it's
11    directly --
12              THE COURT:  Pay money, that's perfect.  Pay money to
13    the reinsurer, who then takes on this risk.  I agree.  That's a
14    good way to put it, better way to put it, in fact; right?
15    That's what happens?
16              MR. SKLAVER:  Okay.
17              THE COURT:  Is that not a cost?
18              MR. SKLAVER:  Well, it's not a -- first of all, is
19    that a cost?  There is a debate about whether or not that is a
20    cost, actually.  There are some carriers that don't consider
21    reinsurance to be an expense; they consider it some other
22    factor.
23              Here, just to lay out -- because it does matter
24    Lincoln's role -- they paid Voya a billion dollars to get all
25    of the flow of premium of this block of policies and other
```

L5CGHANC

| | |
|---|---|
| 1 | policies.  They also took over the obligation to pay the death |
| 2 | benefits.  So that's why they're the hundred percent indemnity |
| 3 | reinsurer.  Lincoln lays off some of that risk, as the Court |
| 4 | has explained, to another reinsurer.  And that whole |
| 5 | transaction has ruined, they claim, the profitability that was |
| 6 | expected of the transaction in 1998 when they paid a billion |
| 7 | dollars.  And so they are comparing some of those issues now, |
| 8 | as it's all part of the profitability goals to make more money |
| 9 | off the 1998 transaction than they are now.  And what happens |
| 10 | is Mr. Pfeiffer, in his report -- and that's how we got to this |
| 11 | motion -- imagines a but-for world where reinsurance is taken |
| 12 | out of the entire equation back in 2016 and starts opining on |
| 13 | what that would look like for the COI increase.  It's not a |
| 14 | liability issue; it's a damages issue.  And Professor Babbel |
| 15 | even has a chart -- we put a picture of it in our brief -- |
| 16 | where he says, well, if you include reinsurance or other |
| 17 | factors, then damages should go down by 5 percent, 10 percent, |
| 18 | 15 percent, goes all the way up to 30 percent in 5 percent |
| 19 | increments.  And as Judge McMahon held in the *US Bank v. PHL* |
| 20 | case, that's not an appropriate approach for an expert because |
| 21 | it's made up out of thin air.  You have to prove that at the |
| 22 | time, under consideration for the COI increase, there was |
| 23 | actual evidence of this modeling that took out this |
| 24 | impermissible factor. |
| 25 | THE COURT:  Wait a minute.  You are suggesting that at |

L5CGHANC

1   the time, what, the policy was written and the COI increase

2   provision was written that you look at that moment in time, and

3   what the costs were then are the only costs that can be

4   considered at a later point in time; is that your position?

5           MR. SKLAVER:  One of our positions is the baseline

6   comparison, when you look at costs or profitability, it's what

7   happened when the policies were sold to the members of the

8   class.  The contract was entered into, let's say for

9   Mrs. Hanks, in 1984.  So you don't look at some fancy

10  transaction that happened with a stranger company in 1998 to

11  figure out what the appropriate costs and profits are.  So to

12  put it in concrete terms, Voya now is making more in profit,

13  after the COI increase, than they were projecting to make at

14  sale in 1984 and even in 1998 with the indemnity reinsurance

15  transaction.  So whether or not it's a cost or a profit, the

16  spread, the projected profit is much higher than at issuance or

17  in 1998.  And that's what the claim is that survived on summary

18  judgment.  And on the issue of damages, this hypothetical, what

19  would have happened based on some theory that there's no

20  evidence of is what should be excluded.  And in fact, the

21  defendant concedes that.  They say they're not -- I mean, their

22  lawyers, in the briefing say, we are not seeking an offset and

23  we are not going to submit evidence of a hypothetical

24  redetermination.  But their experts do just that.  And that's

25  why the motion should be granted.

L5CGHANC

1          THE COURT:  Well, we're going to unpack this, okay.

2     When were the policies first issued?

3          MR. SKLAVER:  Roughly between, I believe, 1983

4     through, I think, 2000.  There's over 45,000 policies in the

5     class, but that's roughly the --

6          THE COURT:  What's the starting year?

7          MR. SKLAVER:  1983.

8          THE COURT:  So only future costs that were considered

9     in 1983 may be considered or only future costs that were

10    considered as late as 2001 may be considered in your view of

11    the world?

12         MR. SKLAVER:  Well, it's in view of the summary

13    judgment order as well, right.  The summary judgment order --

14    can I quote from the summary judgment order?

15         THE COURT:  Sure.

16         MR. SKLAVER:  So --

17         THE COURT:  Maybe I screwed up.

18         MR. SKLAVER:  "But the Court finds genuine disputes of

19    material fact as to Hanks' contention that the 2016 COI

20    adjustment was calculated based upon impermissible profit

21    factors.  This, Hanks alleges" -- and this is on Page 23 to 24

22    of the order -- "This, Hanks alleges, was done in order to

23    remedy Lincoln Life's disappointing returns from the 1998

24    reinsurance indemnity transaction.  Hanks further asserts that

25    the rationale underlying the 2016 COI adjustment was profit

L5CGHANC

| 1 | driven, failing to consider actual costs of insurance and |
|---|---|

driven, failing to consider actual costs of insurance and

resulted in profits at a level exceeding that anticipated when

the class policies were originally sold."

      THE COURT:  That was your position?

      MR. SKLAVER:  Yes.

      THE COURT:  Did I accurately summarize it in my

decision?

      MR. SKLAVER:  Yes.

      THE COURT:  So what are you saying I ruled?

      MR. SKLAVER:  On Page 23, "But the Court finds genuine

disputes of material fact as to Hanks' contention that the 2016

COI adjustment was calculated based on impermissible profit

factors.  This, Hanks alleges, was done in order to remedy

Lincoln Life's disappointing returns from the 1998 reinsurance

indemnity transaction.  Hanks further asserts that the

rationale" -- so then it goes through our position -- and then

the Court says, "COI rates adjustments may only be based on

estimates of future cost factors."

      THE COURT:  Now you are getting to my ruling, so go

ahead.

      MR. SKLAVER:  "Which can include, but are not limited

to, mortality, investment income, expenses, and the length of

time policies stay in force.  Accordingly, the rate increase

embodied in the 2016 COI adjustment should have been based on

increase in the costs associated with the in force policies.

L5CGHANC

1    Implementing an increase in the COI rate in order to raise

2    profits without an analysis of relevant cost factors would

3    violate the terms of the policy.  However, costs fundamentally

4    have an affect on profits which, generally speaking, are a

5    measure of revenues minus costs.  Consideration of spiraling

6    costs is appropriate.  And these rising costs may also be

7    reflected in a deteriorating profit margin.  Here, an issue of

8    material fact remains as to whether the 2016 COI adjustment was

9    based on analysis of cost factors related to the in force

10   policies, as mandated by the terms of the policy, or was based

11   on Lincoln Life's profitability goals.  Hanks puts forth

12   evidence and expert opinions supporting its position that the

13   2016 COI adjustment was based not on an evaluation of future

14   cost factors but was implemented on the basis of improper

15   considerations with the aim of increasing anticipated future

16   profitability."  And then there's a long string cite of the

17   evidence.

18          THE COURT:  I have it here.  Do you want me to read

19   the string cite or what do you want to do?  Go ahead.

20          MR. SKLAVER:  No, your Honor.  So the point is that

21   this all goes to the issue of liability.  The motion *in limine*

22   here at issue has to do with damages.  And the question on the

23   motion *in limine* is, a hypothetical COI increase that Voya

24   contends complies with the contract and is not improperly based

25   on Lincoln Life's profitability goals, is that a defense to

L5CGHANC

```
1    damages.  And the answer is no, because there is no evidence,

2    nothing in the record that any of this was considered in 2016.

3    And under the US Bank case, that means it should be excluded

4    because it's hypothetical.  That's it.  This is a damages

5    issue.  And they have no evidence of the but-for world being

6    ever considered by Voya.

7             THE COURT:  I'm not sure I understand your argument,

8    but let me give the defendant an opportunity to respond.

9             MS. HENRY:  Thank you, your Honor.

10            So I'd like to start with the question your Honor

11   posed or the framework that your Honor posed, which is

12   reflected in your Honor's summary judgment ruling.  If Voya

13   determined that its profits were going to zero because costs

14   were going up, is that bad?  Is that an inherently bad thing?

15   And I think that Mr. Sklaver said that is not what this case is

16   about.  That's exactly what this case is about.  That's exactly

17   what happened.  And what we're talking about here in respect of

18   this motion and damages -- I'm sorry, your Honor, with the

19   masks.

20            THE COURT:  Take your time.

21            MS. HENRY:  -- is not a hypothetical but-for world.

22   It is exactly what was considered at the time of the analysis

23   in 2016.  In 2016, the evidence is clear that what was

24   considered, among other things, was a deterioration in

25   investment income and reinsurance costs.  And that is exactly
```

L5CGHANC

1    what was told to Ms. Hanks and the other policyholders.  That

2    is what the internal analysis will show, does show.  There's

3    been inordinate amounts of testimony about this.  That is what

4    the evidence at trial will show.

5            THE COURT:  Well, let me pause.  Do you contend that

6    those were impermissible future costs on which to base an

7    increase, the deterioration in investment income?  I don't know

8    anything.  I don't know whether there was or there wasn't or

9    whether that was a lie or not.  But I'm asking, is a

10   deterioration in investment income and increased costs of

11   reinsurance, meaning reinsurance secured by Lincoln Life laying

12   off the risk, improper cost considerations?

13           MR. SKLAVER:  The answer is yes, due to how the COI

14   increase was implemented and adopted.  So let me explain it

15   very simply, I hope.  Let's say, in 2004, when the policy was

16   sold, using those cost factors, Voya had a projection of

17   profits of X.  In 1998, when Lincoln did the transaction, they

18   had a projected profit factor of Y.  The COI increase using

19   these factors came out with a profit projection of Z.  Z is

20   greater than both Y and X, and Z is the profit.  And our claim

21   is that that is an improper profit consideration.  They didn't

22   just move the numbers appropriately.  They padded it to --

23           THE COURT:  No, I got it.  Padding sounds to me like

24   it's likely actionable.  So I'm not arguing about padding.

25           I'm arguing is deterioration in investment income

L5CGHANC

1    properly documented and properly considered?  Can it be

2    properly considered as a future cost estimate?

3            MR. SKLAVER:  As a theoretical matter, yes.

4            THE COURT:  All right.  Well, this is helpful.  And

5    I'm totally open minded.  I have no idea.  They may have lied

6    or exaggerated or inflated.  And that's what I understand we're

7    having a trial about.  So I don't have a problem with you

8    endeavoring to prove that their future estimates were not

9    good-faith future estimates, they were something else.

10           And the same way with the cost of reinsurance.  Do you

11   dispute that increases in the future costs of or estimates of

12   future costs of reinsurance are -- if done in good faith and

13   not inflated -- a proper consideration?

14           MR. SKLAVER:  Depends on the contract and the terms,

15   it can be.  Theoretically, it could be.  But it was not done

16   here, and that's the disputed question.

17           THE COURT:  And it was not done here on a good-faith,

18   noninflated basis is what you're saying?

19           MR. SKLAVER:  That's one argument, yes.

20           THE COURT:  So far, that sounds like an appropriate

21   theory to pursue at trial.  I don't have a problem with that.

22           Go ahead.

23           MS. HENRY:  And your Honor, in respect of damages,

24   what we are saying is that if the plaintiff wants to pursue the

25   argument that reinsurance, although it's proper under the

L5CGHANC

1    contract, was in effect not done properly here -- which we

2    obviously dispute -- but if that's an argument they want to

3    pursue, but what the jury ultimately determines is that

4    consideration of investment income which justifies 95 percent

5    of the cost of insurance increase was proper, but the

6    reinsurance which justifies only 5 percent of the cost of

7    insurance increase wasn't proper, right, they can't collect

8    $100 of damage, if $95 of it was proper and $5 of it was not

9    because --

10            THE COURT:  They are not arguing that.  I don't

11    believe it.

12            MS. HENRY:  They are arguing that, your Honor.

13            THE COURT:  I don't believe that.

14            MS. HENRY:  They are arguing that.  That's what this

15    motion is about.

16            THE COURT:  You're under an obligation to state fairly

17    what the papers say.  I can't believe the plaintiffs would

18    argue that.

19            MR. SKLAVER:  We're not.

20            THE COURT:  Good.  Thank goodness.

21            MS. HENRY:  Let me clarify that.  If they're not

22    arguing that, your Honor --

23            THE COURT:  That's good.  You just won something big.

24            MS. HENRY:  Good.  Thank you, your Honor.

25            THE COURT:  I'm glad to hear that.  That's good news.

L5CGHANC

1    Because I wasn't sure myself what folks were arguing.

2            So we're having a trial.  We need a trial.  I'm fine

3    with that.  And I'm fine with you going forward in front of

4    this jury that they were obligated to make an estimate of

5    future costs, they were allowed to make estimate of future

6    costs on deterioration or lack of deterioration on investment

7    income and on cost of reinsurance.  But instead of doing a

8    good-faith estimate of these costs, they lied or inflated or

9    didn't act in good faith.  That's what I think this case is

10   about, from the plaintiffs' standpoint and from the defendant's

11   standpoint.

12           Tell me what I'm missing from the plaintiffs'

13   standpoint.  And then I'm going to ask the defendant what I got

14   wrong from their standpoint.  So go ahead.  You need to educate

15   the trial judge.

16           MR. SKLAVER:  I think, your Honor, I have no quibbles

17   with what the Court just said.  And this is a damages motion *in

18   limine*, and they have admitted that they are not seeking an

19   offset, so the motion should be granted.

20           THE COURT:  Let me hear from the defendants first on

21   my articulation of what we're trying here.

22           MS. HENRY:  Your Honor, we agree with the articulation

23   of what we're trying here.

24           THE COURT:  I hope someone will do me the favor of

25   kind of framing this and putting it under glass someplace.  And

L5CGHANC

1    we'll keep it up on the bench here so that I know at trial what

2    I'm trying.  Because that's worth the final pretrial conference

3    just in that.

4            Now, getting back to the application to the *in limine*

5    motion.  Argument inconsistent with what I've just said from

6    Merrill or anyone else or Pfeiffer will not be allowed.  So if

7    the plan was to offer a new set of cost considerations that

8    were never considered, defendants have not demonstrated that

9    that would be a proper thing to do.  If it had never been

10   considered and wasn't in fact considered, that is what I would

11   consider to be an alternate or hypothetical rationale.  But

12   with regard to the arm wrestle on whether the costs were

13   estimated in good faith, the future costs were estimated in

14   good faith, that's the appropriate arena for the experts to

15   opine.

16           With regard to theoretical interest rate and duration,

17   I don't quite understand the point and maybe the plaintiff

18   could explain it to me.

19           MR. SPEAR:  Your Honor, on the duration motion, the

20   issue there is the analysis is entirely divorced from the facts

21   of this case, because Professor Merrill admitted at his

22   deposition that he had no idea what Lincoln or Voya's

23   investment plans were, what rates they use internally, what

24   assumptions they use, what cost factors they use.  So abstract

25   statements about what could have happened if certain things

L5CGHANC

```
1    looked certain ways aren't helpful to the jury and is

2    impermissible ipse dixit by an expert.  So our position isn't

3    that those are improper areas if done correctly, but because

4    Professor Merrill admittedly has no idea about the facts of

5    this case, he shouldn't be allowed to go to the jury and just

6    sort of speak in the abstract because he doesn't tie it to

7    anything.

8               THE COURT:  Well, I'm not going to allow anybody to

9    testify in the abstract, particularly about the facts of this

10   case, if they don't have a factual basis to it.  So you can

11   either raise an objection and I'll sustain it or if the

12   testimony comes in and it's inappropriate, I'll strike it.

13               MR. SPEAR:  Thank you, your Honor.

14               THE COURT:  I don't understand the defendant's

15   argument that no damages are suffered by policyholders who had

16   level death benefit policies and are now deceased or who had

17   level death benefits with policies and remain in force where

18   the policy never made increased payments into the policy

19   following the 2016 COI rate increase.  Maybe I understand the

20   first part of it.  If the death benefit didn't change and there

21   was no rate increase, then there's no damage, if that's your

22   argument.  I really don't think I understand your argument.  So

23   why don't you put it to me in simple terms.

24               MS. HENRY:  Yes, your Honor.  So to step back, there

25   are basically two kinds of policies at issue here.  And we're
```

L5CGHANC

1    focused on the so-called level death benefit component of the

2    policies.  And with a level death benefit, you purchase a

3    policy, which has, as a death benefit, whatever the enumerated

4    number is, $3 million in the case of some that we use as

5    exemplars in the motion.  And as long as that policy remains in

6    force, your beneficiaries get that $3 million when you pass

7    away.

8          If your account value when you die is $2,999,999, your

9    beneficiaries get $3 million.  If your account value when you

10    die is $1, your beneficiaries get $3 million.  The account

11    value is irrelevant to the death benefit that you purchased.

12    That is what a life insurance policy is.  You purchase the

13    death benefit.  You pay a certain amount of money in exchange

14    for the death benefit.  In a level benefit policy, that death

15    benefit does not change with the value or the amount of the

16    account value.

17          And so the point that we are making here is that for

18    people who passed away after the cost of insurance increase was

19    implemented and their beneficiaries were paid the full amount

20    of the death benefit, there was no damage.  They got what they

21    paid for, and they did not pay any more for it.  They never

22    made additional payments into their account value.  Yes, more

23    money was taken out of the account value, but that is of no

24    moment because, when they die, all their beneficiaries get is

25    the level death benefit, irrespective of what's in there,

L5CGHANC

1  whether it's $1 or whether it's $2,999,999.  So those people

2  simply were not damaged.  And the mistake that the plaintiffs

3  are making is that they're equating account value to damage.

4  They are treating it like a bank account.  It is not a bank

5  account.  It's just fundamentally different.  When they die,

6  when these people die, the value of the account value is

7  reduced to zero.  It goes nowhere.  It's not like your Citibank

8  checking account where you bequeath that to your heirs.  It's

9  not what happens here.

10          THE COURT:  Let me give the plaintiff an opportunity

11  to respond.

12          MR. SKLAVER:  Yes, two points.  First, I want to just

13  correct a statement that was asked of defense counsel.  The

14  hypothetical that was provided where no future premiums are

15  paid into the account value and the insured dies, there is

16  still a COI overcharge deduction made from the account value.

17  So even in those situations, more money is taken from your

18  account than should have been but for the breach.

19          THE COURT:  And if this were a disgorgement action,

20  that would be highly relevant.  It's not.

21          MR. SKLAVER:  Correct.  It's a breach of contract

22  action.

23          THE COURT:  If you were a government agency and you

24  were seeking disgorgement, I would say right on, you go right

25  for that.  But why would it be true on a breach of contract

L5CGHANC

1    theory?

2    MR. SKLAVER:  Because this is a claim brought on

3    behalf of policy owners, not beneficiaries to the policy.  So

4    put into context -- all of her arguments were about

5    beneficiaries of the policy -- think about the plaintiff, class

6    plaintiff Helen Hanks.  The initial beneficiary on her policy

7    was her husband, and the contingent beneficiaries were her

8    children.  She owns the account.  The Court held on Page 2 of

9    its summary judgment order, under the terms of the policies,

10   each policyholder would hold the rights to an account

11   containing any amount paid by the policyholder plus earned

12   interest.  That account is the policyholder's.  They can take

13   money out.  They can do a partial surrender.  They can take a

14   loan against it.  It's their asset.  And that's why courts

15   consistently have held -- that's the *Vogt v. State Farm* case in

16   the Eighth Circuit and the *Bally v. State Farm* case in the

17   Northern District of California -- that if there is an

18   overcharge to your account value, no matter what is paid to the

19   beneficiaries upon death, that's your asset for which money has

20   been taken and you're entitled to it back.  All of this has to

21   do with damages.

22   And let's take one more step back.  This is a case, as

23   we just went through on the liabilities side, about the padding

24   of profits, let's say.  Lincoln, in year one alone earned

25   $23 million in pre-tax profit than they would have but for the

L5CGHANC

increase.  That money came from somewhere.  It came from the

policy owners.  And this attack on level death benefits would

wipe out 72 percent of the damages of the class, because that's

the vast majority, including the plaintiff, who has it.  It's

her account, it's been harmed, that's been a recognized form of

damages.  It is like a bank account, actually.  And Voya

markets it like a bank account.  We submitted that on our

oppositions.  It's an accumulation of cash value.

             If this were a case brought by beneficiaries for death

benefits, it would be a different argument.  But that's not who

owns the claim here for breach of contract.

             THE COURT:  And the breach, what is the period of time

that you go back on the breach?  In other words, how far back

do you go on a breach?

             MR. SKLAVER:  When the first monthly deduction is made

at the account value under the new COI rates post-increase.

             THE COURT:  And you're asserting that these people

were alive at that point; is that your point?

             MR. SKLAVER:  Yes.  There would not have been a

deduction from your account value if the policy had matured,

correct.  So everyone for which a level death benefit has been

paid has paid a COI overcharge under the new rate scale at

issue for trial.

             THE COURT:  Well, you all can dust off your *in

limine*s, dust off your cases and get me a brief on that issue

L5CGHANC

1    in the next 30 days.  You can cull out arguments you have

2    already made, but focus on this issue and let me see.  Let me

3    see.

4            MS. HENRY:  Thank you, your Honor.

5            THE COURT:  And future overcharge damages, why isn't

6    that speculative?  You don't know whether, if this court, the

7    jury in this court finds for the plaintiff and the Court enters

8    judgment based on that finding and denies a post-verdict

9    motion, you don't know whether they'll still continue to

10   unlawfully overcharge; right?  You don't; right?  Lots of

11   things can happen.

12           MR. SKLAVER:  Well, your Honor, we do.  Because we

13   have squarely asked the defendant to take the position right

14   now to commit to reversing the increase if there's a finding of

15   liability.

16           THE COURT:  And they haven't answered you; right?

17           MR. SKLAVER:  Well, they have refused to make that

18   commitment.  So they have answered.

19           THE COURT:  So that's an answer of no, because they

20   refuse to make a commitment to you?

21           MR. SKLAVER:  Well, that, and combined with the

22   following:  The COI increase was designed to be permanent.

23   It's projected to last.  There's a COI rate scale as part of

24   the increase that's designed to last for 30 years.  They have

25   the spreadsheets that they apply the deductions every month.

L5CGHANC

1    And so the standard under Texas law is whether the damages can

2    be proven with reasonable certainty.  And it's not

3    epistemological certainty, right, there would never be future

4    damages allowed because no one knows if the sun will come up

5    tomorrow, in theory.  But the point is you have an actuarial

6    system that has COI rate scales that go for the life of the

7    policies.  And all Mr. Mills did in this report is use that

8    system to calculate damages.  At best, what's going to

9    happen -- that's a jury question -- they can get up on the

10   stand and say, we don't know what we're going to do or, if they

11   say we promise to reverse it, we'll withdraw the request for

12   future damages.  That's all we are asking for.  We're just

13   trying to prevent them from having it both ways.

14        THE COURT:  And that commitment would not be

15   admissible; right?

16        MR. SKLAVER:  Well, the commitment would be

17   admissible -- if they provide the commitment now that they will

18   reverse the increase, we will withdraw our request for future

19   damages.

20        THE COURT:  You didn't answer my question.  The

21   commitment would not be admissible?

22        MR. SKLAVER:  It would be admissible, because I think

23   it would thereby gut their request for future damages if they

24   commit right there --

25        THE COURT:  So you get to put it in front of the jury?

L5CGHANC

1    If the jury is not presented with a claim for future damages,

2    what business is it of the jury?

3              MR. SKLAVER:  I'm sorry, your Honor.  You are right.

4    I misunderstood the premise.  If future damages are not at

5    issue at trial, we can't ask that question.  I agree.

6              THE COURT:  You can't offer and have received into

7    evidence that commitment; is that correct?

8              MR. SKLAVER:  If future damages are not permitted, I

9    agree, your Honor, yes.  We don't intend to do that.  Agreed.

10             THE COURT:  So I'm going to require the defendants to

11   state their position in writing 21 days from now.

12             MS. HENRY:  Thank you, your Honor.

13             THE COURT:  So let's talk about trial.  It seems to me

14   this case can be tried in ten days.  Does that sound

15   reasonable?

16             MR. SKLAVER:  Probably less, your Honor.  I think the

17   parties have estimated between five to seven.

18             THE COURT:  Is that the estimate, five to seven?

19   Seven days is your estimate of the trial, the defendant's

20   estimate?

21             MR. SHULMAN:  Your Honor, in light of the Judge's

22   rulings today, I think seven days or less.

23             THE COURT:  Seven days or less, all right.  So the way

24   this works is -- and I want to give you some context here --

25   the folks that you saw when you walked in who were here for a

L5CGHANC

1    sentencing tried their case last fall, jury was impaneled, jury

2    reached a verdict on October 21st.  In this court, we have had

3    1,400 jurors report for jury service since last fall.  And from

4    September 29th to April 30th, 2021, we've had 32 jury trials.

5    We've scheduled many more than that, but we have conducted 32

6    jury trails.  Since September 29th, I have tried four jury

7    trials to completion.

8            I will put this case in for a jury selection date.

9    The days that used to exist when a judge could say I am the

10   monarch of this courtroom, I say this case goes to trial on

11   such and such a date, and that's the law don't exist under the

12   present pandemic regime.  And so what happens is by Sunday

13   night at midnight, I will put in a request for the third

14   quarter of 2021.  And on August 15th, I will put in a request

15   for the fourth quarter of 2021.  The placement of the request

16   will be based on a protocol -- which I had a hand in

17   drafting -- which prioritizes cases based on a variety of

18   factors; obviously, criminal over civil, criminal felony over

19   criminal misdemeanor, criminal detained defendant over criminal

20   nondetained defendant, and then civil cases, including the

21   length of trial and the like.  I looked at the dates of your

22   availability, and I think there was one week in September where

23   no one has any objection.  That was it.  So I can put in for

24   the third quarter, but you seem to be telling me you're not

25   available to try the case in the third quarter.

L5CGHANC

1          Do you want a trial date in the third quarter?  Tell

2     me what date you would like, and I can put in for it.

3          MR. SKLAVER:  Well, the plaintiff does, your Honor.

4     We were available the entire third quarter, except for we've

5     noted the Jewish holidays.  I think with the overlap, if you

6     assume all defendant's unavailabilities applied, I think the

7     last week of September is the only one I saw --

8          THE COURT:  Well, maybe you guys have a better

9     diagram.  July 6th through July 16th, there are professional

10    commitments of somebody's actuarial expert.  July 22nd to

11    August 3, there's the wedding of a child for Voya's counsel.

12    Mid July to mid August, the regulatory expert is not available

13    for medical reasons.  August 11th, 12th, 13th, and 16th are not

14    available because of a child's wedding.  August 23 through 26,

15    due to a previously scheduled professional commitment.  And

16    August 16th through August 20th due to previously scheduled

17    family commitments for an important witness.  I didn't make

18    that up.

19         MR. SKLAVER:  Those are all the defendant's, your

20    Honor.

21         THE COURT:  So when is everybody available to go to

22    trial?

23         MR. SHULMAN:  May I, your Honor.

24         THE COURT:  You may.

25         MR. SHULMAN:  I would suggest the fourth quarter is

L5CGHANC

| | |
|---|---|
| 1 | more appropriate for two reasons. First of all, there are |
| 2 | scheduling issues. But separate from that, as your Honor |
| 3 | reflected earlier, the parties have made various commitments |
| 4 | with regard to refreshing the data and supplemental expert |
| 5 | reports. The parties intend to mediate this case in August. |
| 6 | So I think all of those things point towards giving the parties |
| 7 | some time to absorb your Honor's rulings today, deal with the |
| 8 | data issues, give every opportunity to deal with the conflict |
| 9 | issues and to schedule this in the fourth quarter, which is |
| 10 | sufficiently far away that I think the conflicts will be |
| 11 | minimal, and it's still within this calendar year. |
| 12 | THE COURT: Let me start with the defendant, then. |
| 13 | What blackout dates, if any, are there in the fourth quarter? |
| 14 | MR. SHULMAN: There are none, your Honor, besides the |
| 15 | secular holiday, Christmas and things like that. |
| 16 | THE COURT: Right. |
| 17 | MR. SKLAVER: The plaintiff has substantial conflicts |
| 18 | in the October, both in the beginning with the class |
| 19 | representative, as well as another trial that's scheduled in |
| 20 | the District of Connecticut that Mr. Ard is trying. And then |
| 21 | we have an expert unavailability at the end of October. So if |
| 22 | we're going to the fourth quarter, it seems like November or |
| 23 | December would be available. |
| 24 | THE COURT: What I will do, then, is I'll put this |
| 25 | case in for November and December of the fourth quarter, and |

L5CGHANC

1    we'll see what happens.  But the one thing that you all should

2    understand is when I come back to you and I say, it's

3    November 13th, it's not going to work like in other times,

4    judge, that's great, could you just make that November 21st.

5    Can't do it.  Can't do it.  I have that spot in the jury

6    assembly room that morning, and that's where we are.  And you

7    may find out you're also a backup trial.  And that's likely to

8    be the case when you are a civil case.  Nevertheless, hundreds

9    of cases are getting scheduled and they're resolving out or

10    getting tried.  So it's as good as it can be under the present

11    circumstances.

12         MR. SKLAVER:  Your Honor, a mechanical question -- and

13    it may be unknown -- when would you know or when would the

14    parties know when in November or December?

15         THE COURT:  Very good question.  First of all, I have

16    been faithful to this all the way through.  When I find out, I

17    would say, not more than 72 hours, it's probably maybe even

18    within 24 hours of my finding out, you'll know.  If I put it in

19    on August 15th, I will probably not know until the end of

20    August.  It takes a lot of work by the clerk's office to put

21    together the calendar and sort things through.  And then the

22    calendar would be released to judges, and then I would know.

23    And then I would issue an order.

24         And it is my practice, if you are a backup case, and

25    it's a backup to another specific case, I would give you the

L5CGHANC

```
 1    docket number of that case.  No secret there.  So I have a
 2    civil case on right now for June 30, they're the second backup.
 3    And I told them promptly, as soon as I found out, and I gave
 4    them the docket number of the case ahead of them.  The civil
 5    case that went on September 14th was a backup to a class action
 6    that was going to trial, and I guess what happened was I was
 7    able to substitute a different civil case for the one that was
 8    going, which is something of an exception to the rule.  But I
 9    was allowed to do that, and then that other civil case got
10    dropped in.  So we'll see.
11         It would probably not be tried in this courtroom.  It
12    would probably be tried in one of the larger courtrooms.  If
13    you go up to the 26th floor, you can see the setup.  It works.
14    There is Plexiglas around the witness with a HEPA filter
15    extracting the air and a similar device around the podium so
16    that lawyers can take their face masks off during jury
17    addresses or examinations of witnesses.  And once the trial is
18    underway, it's more like any other trial than it is a pandemic
19    trial.  The difficulty for you all is you're only going to get
20    two people at counsel table.  We can work on wiring so that
21    you'll be able to have your paralegal or your tech person in
22    the gallery.  But you won't likely have more than two at
23    counsel table.  That's the way it works.  Sometimes we can do
24    it the way it's being done today with a third person at the
25    table, but there's no guarantee.  It depends on the particular
```

L5CGHANC

1  courtroom.

2          MR. SKLAVER:  Is that two human beings total or is

3  that two lawyers, although we are human --

4          THE COURT:  Human beings.  You can do it any which way

5  you want.

6          MR. SKLAVER:  Okay.

7          THE COURT:  And this Court has been very fussy about

8  cell phones, but the ban has been lifted so that you can, even

9  in the courtroom, text your paralegal, I need the next witness.

10  How else is this going to work?  So we've made accommodations

11  in that regard.

12          Anyway, I want to commend you all for the work done on

13  the pretrial order and the motions *in limine*.  You are well

14  organized, which is important, and very clear in your briefing.

15  And so I'm very pleased, I'm very happy to have you as lawyers

16  appearing before me, because I don't always get that.  So this

17  is really great.  I don't apologize for asking whatever

18  question comes to mind or asking people to explain something

19  three times because I didn't pick it up the first two times,

20  but that's all part of the process.

21          So I wish you good luck with the mediation.  But this

22  case is going to go.  It's not in some pile with a hundred

23  other cases.  It's, at this point, pretty much at the top of my

24  list, and it's going to go.

25          Anything further from the plaintiff?

L5CGHANC

1          MR. SKLAVER:  No, your Honor.  Thank you, and to the

2     staff, for everyone's time.

3          THE COURT:  Well, thank you for great presentations

4     all around.

5          Anything further from the defendant?

6          MR. SHULMAN:  No.  Thank you, your Honor.  It's a

7     pleasure to be back here.  And it's a sign that hopefully

8     things are getting back to normal.

9          THE COURT:  Let's hope so.  And thank you all for the

10    hard work on the motion papers and excellent work on the oral

11    presentations.  Thank you.

12          (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25